## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| UNITED BANK | ) | Case No. 2:24-cv-03 |
| 11185 Fairfax Boulevard | ) | |
| Fairfax, VA 22023 | ) | (Judge Kleeh) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ALLEGHENY WOOD PRODUCTS, INC. | ) | |
| 240 Airport Rd. | ) | |
| Petersburg, WV 26847 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALLEGHENY WOOD PRODUCTS | ) | |
| INTERNATIONAL, INC. | ) | |
| 240 Airport Road | ) | |
| Petersburg, WV 26847 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALLEGHENY WOOD TIMBER | ) | |
| PRODUCTS, LLC | ) | |
| 240 Airport Road | ) | |
| Petersburg, WV 26847 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| John W. Crites, II | ) | |
| 417 Point Drive | ) | |
| Petersburg, WV 26847 | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER APPROVING SALE OF RECEIVERSHIP PROPERTY  RIVERTON FACILITY FREE AND CLEAR OF ALL CLAIMS, LIENS, AND ENCUMBRANCES

This matter came before the Court on the *Motion to Approve Sale of Receivership Property Riverton Facility Free and Clear of All Claims, Liens, and Encumbrances* (the "**Motion**") filed by Christopher Deweese, solely in his capacity as court-appointed receiver in the above-captioned proceeding (the "**Receiver**"). The Motion seeks approval of the transaction contemplated by the Asset

Purchase Agreement (the "APA") between Receiver and RiverKing Lumber Products, Inc. (the "**Buyer**"), a copy of which is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

Pursuant to the APA, the Receiver seeks to sell all or substantially all of the assets of Borrowers used or held for use in connection with Borrowers' business operations at the Borrowers' sawmill located at Riverton, West Virginia as more particularly identified in Section 2.02 and Schedule 1.01 and 2.02 to the APA, but excluding certain "Excluded Assets" identified on Schedule 2.03 to the APA (collectively, the "**Property**") for a purchase price of $1.2 million (the "**Purchase Price**") free and clear of all claims, liens, interests and encumbrances.

### Findings of Facts

Based on the Motion and the arguments of counsel, the Court finds as follows:

1.     The Property is property of the receivership estate and subject to the Order Appointing Receiver entered on March 6, 2024, as subsequently amended by the Amended Order Appointing Receiver entered on March 27, 2024, and the Agreed Order Amending the Order Appointing Receiver Nunc Pro Tunc entered on May 21, 2024 (the "**Receivership Order**").

2.     The Receiver is currently in possession and control of the Property.

3.     The proposed sale pursuant to the APA (the "**Sale**") is commercially reasonable and the Purchase Price for the Property represents the fair market value of the Property.

4.     The APA has been approved and stipulated by United Bank, a Virginia banking institution, successor by merger to United Bank, Inc. ("**United**"), as well as Allegheny Wood Products, Inc. ("**AWP**"), Allegheny Wood Products International, Inc. ("**AWPI**"), and Allegheny Wood Timber Products, LLC ("**AWTP**") (collectively, the "**Borrowers**"), and by John W. Crites, II ("**Crites**").

5.     The sale of the Property pursuant to the APA is in the best interests of the Receivership Estate, United, and all other interested persons and entities for the reasons set forth in the Motion.

106250732.2

6.      The Receiver's sale of the Property to the Buyer pursuant to the terms of the APA is the result of good faith, arms-length negotiations by and between the Receiver and the Buyer and the Buyer is a "good faith" purchaser of the Property pursuant to W. Va. Code § 55-21-16(f) and entitled to all rights, privileges and protections thereof.

7.      United and Borrowers consent to the Sale.[1] All other necessary parties-in-interest were duly served with notice of the hearing on the Motion and had a full and fair opportunity to object to the Sale.

**Legal Grounds For Sale**

8.      The West Virginia Uniform Commercial Real Estate Receivership Act, W. Va. Code § 55-21-1 *et seq.* (the "**Act**") authorizes sales of receivership property.

9.      Section 55-21-12 of the Act permits the Receiver to sell receivership property other than in the ordinary course of business with court approval.

10.     Section 55-21-16(c) permits the Receiver, with court approval, to sell receivership property free and clear of liens but that liens extinguished by such sale attach "to the proceeds of the transfer with the same validity, perfection, and priority the lien had on the property immediately before the transfer, even if the proceeds are not sufficient to satisfy all obligations secured by the lien."

11.     Pursuant to the Receivership Order, the Receiver is authorized and directed to take possession, and assume exclusive control, of the Receivership Estate and to sell or otherwise dispose of the Property, subject to confirmation by this Court and on regular notice to the parties to this case. Receivership Order, §§ 6.a and 6.o.

---

[1]      All capitalized terms not otherwise defined herein shall have the same meanings as ascribed to them in the Motion.

12.     The Receivership Order further authorizes the Receiver to "market and sell all or any part of the Receivership Estate either pursuant to the rights granted under the Loan Documents [held by Lender] or as otherwise provided at law or equity." *Id.*

13.     In the present case, the Receiver and Buyer have pursued the Sale of the Property in good faith and in the sound exercise of their business judgment. The Receiver and Buyer have negotiated the proposed Sale in good-faith and through arm's-length negotiations. The Sale is in the best interest of the receivership estate and the creditors of the estate, and sound, good, and valid business reasons exist to permit the Sale in accordance with the Receivership Order and the APA.

14.     Based on the facts set forth in the Motion, the Court's findings of fact, and based on the arguments of counsel, the Purchase Price represents the fair market value of the Property. The sale of the Property pursuant to the APA is commercially reasonable and is in the best interest of the receivership estate, United, and all other interested persons and should be approved on the terms set forth in the APA.

15.     Notice of the hearing on the Motion is appropriate under the Act.

WHEREFORE, the Court hereby orders as follows.

A.     The sale of the Property to the Buyer at the Purchase Price and pursuant to the terms of the APA is commercially reasonable, represents the fair market value of the Property, and is in the best interest of the Receivership Estate, and is hereby approved.

B.     The Buyer is a "good faith" purchaser of the Property pursuant to W. Va. Code § 55-21-16(f) and is entitled to all rights, privileges and protections thereof.

C.     The sale of the Property to the Buyer free and clear of all liens, claims, interests and encumbrances is hereby approved on the terms set forth in the APA, and any and all liens, claims, interests, and encumbrances shall attach to the proceeds of the Sale to the same extent as such liens, claims, interests, and encumbrances attached to the Property prior to the sale.

106250732.2

D.      Appropriate notice of the Sale of the Property and notice of the hearing on the Motion was given to United and all necessary parties-in-interest in accordance with the Act by service of a copy of the Motion. All parties had a full and fair opportunity to object to the sale of the Property.

E.      The Receiver is hereby authorized to execute and deliver all further documents, instruments, and agreements, and to take all actions necessary or desirable to complete the contemplated sale of the Property to the Buyer as set forth in the APA.

F.      Upon the closing of the sale of the Property to the Buyer pursuant to the APA, the Receiver shall deliver possession and control of the Property to the Buyer free and clear of all claims, liens, interest, and encumbrances.

G.      Upon the closing of the sale of the Property, the Receiver is authorized to remit the net proceeds of the Sale—after payment of any selling expenses, closing costs, and receiver's commission—to United on account of its lien on the Property. The $150,000 Kingwood/Riverton deposit forfeited by Buyer shall be applied to Receiver's hourly fees and attorneys' fees and costs related to the sale of the Kingwood and Riverton facilities.

H.      The Buyer, Receiver, United, and any title insurance company issuing title insurance in connection with the sale, and any other party-in-interest shall be entitled to rely exclusively upon the terms and provisions of this Order. Notwithstanding any subsequent dismissal of this case, closing of this case, discharge of the Receiver, or appeal of this Order, this Order shall remain in full force and effect and shall in no manner be deemed vacated or set aside. This Order not only approves the Sale, but serves as confirmation of the Sale, and no further proceedings are or shall be necessary for the Sale to be approved and confirmed in all respects.

I.      The Sale contemplated by the APA is a sale of assets and neither Buyer, by virtue of its acquisition of the Property, nor any lender, by virtue of its receipt of the proceeds from the Sale, shall have any successor or vicarious liabilities of any kind or nature with respect to any alleged

5

liability of Borrowers and/or Receiver except for liabilities expressly assumed by Buyer, if any, pursuant to the terms of the APA.

J.      Except as expressly provided in the APA, the sale of the Property to the Buyer is free and clear of all claims, liens, interests, and encumbrances, and all persons and entities holding claims against or interests in Borrowers or the Property are hereby forever barred, estopped, and permanently enjoined from asserting any such claims or interests against Receiver, Buyer, or the Property.

K.      Borrowers are hereby ordered to cooperate with the Receiver with respect to all matters that may be required to complete the sale of the Property as set forth herein, including the production of any surveys, inspections, or other documents as may be reasonably requested by the Receiver.

L.      This Court shall retain jurisdiction to enforce, interpret, and implement the terms of this Order and any and all documents executed in connection with this Order or in connection with the sale of the Property contemplated hereunder. Notwithstanding any provisions of the Act or relevant law, this Order shall be effective and enforceable immediately upon issuance thereof.

M.      This Order constitutes a final order, and the Court expressly finds that there is no just reason for delay in the entry of this Order.

IT IS SO ORDERED.

The Clerk is directed to transmit copies of this Order to counsel of record and any unrepresented parties.

DATED: September 30, 2024

_____
Hon. Thomas S. Kleeh

6

106250732.2

# EXHIBIT A

**Asset Purchase Agreement**

*Execution Version*

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of September 4, 2024 (this "Agreement"), is made and entered into by and between RiverKing Lumber Products, Inc., a West Virginia corporation (the "Purchaser"), and Christopher DeWeese, solely in his capacity as receiver (the "Receiver") appointed by the United States District Court for the Northern District of West Virginia (the "Receivership Court") in the case styled *United Bank v. Allegheny Wood Products, Inc. et al*, Case No. 2:24-cv-00003-TSK (the "Receivership Case") for, and on behalf of, Allegheny Wood Products, Inc., a West Virginia corporation, Allegheny Wood Products International, Inc., a West Virginia corporation, and Allegheny Wood Timber Products, LLC, a West Virginia limited liability company (collectively, the "Sellers"). The Purchaser and the Receiver, on behalf of itself and the Sellers, are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

## W I T N E S S E T H:

WHEREAS, the Sellers are in the business of producing hardwood lumber and related byproducts at the Acquired Facility (the "Business") and other facilities which are not subject to this Agreement;

WHEREAS, on March 5, 2024, the Receivership Case was initiated in the Receivership Court by the United Bank, as successor by merger to United Bank, Inc. ("United") in which it sought appointment of the Receiver, and which relief was granted and approved by the Receivership Court on March 6, 2024, as amended by the Amended Order Appointing Receiver, dated March 27, 2024 (the "Receivership Order"), whereby the Receivership Court appointed and authorized the Receiver to, among other things, (a) take possession, custody and control of all of the Sellers' business operations, assets and properties (the "Receivership Estate") and (b) market and sell such assets and properties, subject to the terms and conditions set forth in the Receivership Order;

WHEREAS, the Parties entered into that certain Asset Purchase Agreement dated July 12, 2024 (the "Original Agreement");

WHEREAS, the deal among the Parties has changed such that Purchaser will purchase a more limited set of assets for a lower purchaser price and the Parties now desire to amend and restate the Original Agreement to reflect such change; and

WHEREAS, the Original Agreement is hereby terminated and voided in all respects, the Parties hereby have no further rights or obligations under the Original Agreement and any claims under the Original Agreement are hereby waived and released in full, in each case except as specifically memorialized in this Agreement in Section 6.10.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, each Party hereby agrees:

1

## ARTICLE I
## CONSTRUCTION; DEFINITIONS

**Section 1.01.  Definitions**.   The following terms, as used herein, have the following meanings:

"Accounts Receivable" has the meaning set forth in Section 2.03(e).

"Acquired Assets" has the meaning set forth in Section 2.02.

"Acquired Facility" has the meaning set forth in Section 2.02(g).

"Acquired Permits" has the meaning set forth in Section 2.02(j).

"Additional Deposit Amount" has the meaning set forth in Section 3.02(a).

"Affiliate" of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Agreement" has the meaning set forth in the preamble.

"Allocation Schedule" has the meaning set forth in Section 3.04.

"Assumed Contracts" means those Contracts listed on Schedule 1.01(a) (which such schedule may be updated prior to the Closing upon mutual agreement of the Purchaser and the Receiver).

"Assumed Liabilities" has the meaning set forth in Section 2.04(b).

"Bill of Sale and Assumption Agreement" has the meaning set forth in Section 7.02(b).

"Break-Up Fee" has the meaning set forth in Section 9.03(b)(i).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day except Saturday, Sunday or any day on which banks are generally not open for business in Petersburg, West Virginia.

"Business Employees" has the meaning set forth in Section 4.10(a).

"CAA" means the Clean Air Act, 42 U.S.C. §§ 7401 et seq.

"Casualty/Condemnation Loss" has the meaning set forth in Section 6.08(b).

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.

"Charles City Timber" means Charles City Timber and Mat, Inc., a Virginia corporation.

-2-

"<u>Claim Notice</u>" has the meaning set forth in <u>Section 10.05(a)</u>.

"<u>Closing</u>" has the meaning set forth in <u>Section 7.01</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 7.01</u>.

"<u>Closing Payment</u>" has the meaning set forth in <u>Section 3.02(b)</u>.

"<u>COBRA Coverage</u>" means continuation coverage required under Section 4980B of the Code and Part 6 of Title I of ERISA or any similar state Law.

"<u>Code</u>" means the U.S. Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"<u>Competing Bid</u>" has the meaning set forth in <u>Section 9.03(b)(iv)</u>.

"<u>Confidential Information</u>" means all non-public proprietary or confidential information, in any form or medium, with respect to the Acquired Assets, including all information concerning services, prices, sales and other financial results, Intellectual Property, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes.

"<u>Confidentiality Agreement</u>" has the meaning set forth in <u>Section 6.01</u>.

"<u>Contract</u>" means any contract, lease, license, arrangement, indenture, note, bond, mortgage, loan, instrument, guaranty, deed of trust, commitment, undertaking, or other agreement (including any amendments and other modifications thereto), whether oral, written or otherwise.

"<u>Control</u>" means, when used with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"<u>Cure Period</u>" has the meaning set forth in <u>Section 6.08(a)</u>.

"<u>CWA</u>" means the Clean Water Act, 33 U.S.C. §§ 1251 et seq.

"<u>Deposit Amount</u>" has the meaning set forth in <u>Section 3.02(a)</u>.

"<u>Direct Claim</u>" has the meaning set forth in <u>Section 10.05(a)</u>.

"<u>Employment Agreement</u>" means any written or verbal employment Contract, consulting or independent contractor Contract, termination, retention or severance Contract, salary continuation Contract, change of control Contract or any other Contract respecting the terms and conditions of employment or payment of compensation, or of a consulting or independent contractor, leased employee, or similar contingent worker relationship in respect to any current or former officer, employee, consultant, independent contractor, leased employee, or similar contingent worker of any Seller.

"<u>Environmental Law</u>" means all applicable federal, state and local Laws or regulations

derived from or relating to or addressing pollution control, the protection of the environment (including surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or ambient air), Hazardous Materials, and health or safety, including but not limited to CERCLA, OSHA, CWA, CAA, TSCA, and RCRA and any state equivalent thereof.

"Equity Interests" means any and all shares, interests, participations, other equity interests or equity-linked interests of any kind or other equivalents (however designated) of capital stock of a corporation and any and all ownership or equity interests of any kind in a Person (other than a corporation), including membership interests, partnership interests, joint venture interests, phantom stock, stock appreciation rights and beneficial interests, and any and all warrants, options, rights to vote or purchase or any other rights or securities convertible into, exercisable for or related to any of the foregoing.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any Person (whether incorporated or unincorporated) that together with either Seller would be deemed, or would have been deemed within the past six (6) years, a "single employer" or "under common control" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" means Fidelity National Title Insurance Company.

"Escrow Agreement" has the meaning set forth in Section 3.02(a).

"Excluded Assets" has the meaning set forth in Section 2.03.

"Excluded Liabilities" has the meaning set forth in Section 2.05.

"Forfeited Deposit Amount" has the meaning set forth in Section 3.02(a).

"GAAP" means generally accepted accounting principles in the U.S. consistently applied.

"Governmental Entity" means any federal, state, municipal, local or foreign government, any political subdivision thereof, any court, arbitrator or arbitration panel, any administrative or regulatory agency, department, instrumentality, body board, bureau, or commission or other governmental authority or agency (including any taxing or self-regulatory authority) thereof, or any entity exercising executive, legislative, judicial, regulatory, taxing or administrative functions of or pertaining to government.

"Hazardous Material" means any chemical, substance, material, pollutant, contaminant, or waste that is defined as, designated, listed or deemed hazardous or toxic, including but not limited to petroleum and its by-products, asbestos, radioactive materials or wastes, and polychlorinated biphenyls, or is otherwise regulated by, or that may give rise to liability or standards of conduct pursuant to, any Environmental Laws, including but not limited to hazardous wastes under the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. §§6901, et seq., and hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§9601, *et seq.*

"Indebtedness" means, without duplication, as of any particular time, (a) the amount of all indebtedness for borrowed money of any Seller (including any unpaid principal, premium, accrued and unpaid interest, related expenses, prepayment penalties, commitment and other fees, reimbursements, indemnities and all other amounts payable in connection therewith), (b) liabilities of any Seller evidenced by bonds, debentures, notes, or other similar instruments or debt securities, (c) any breakage costs payable upon termination at the Closing of any obligations of any Seller under interest rate swap, currency swap, forward currency or interest rate Contracts or other interest rate or currency hedging arrangements, (d) all outstanding reimbursement obligations in respect of drawn letters of credit issued for the account of any Seller (but for the avoidance of doubt excluding any obligations in respect of undrawn letters of credit), (e) all outstanding severance obligations of any Seller to the extent such obligations arise out of terminations of employment by such Seller prior to or at the Closing, and (f) for the deferred purchase price of assets, services, or securities, "earn-out" payments and other contingent purchase price or payment obligations, whether or not matured, or for any unpaid, accrued or deferred rent obligations, of a Seller.

"Indemnifiable Losses" has the meaning set forth in Section 10.06.

"Indemnified Party" has the meaning set forth in Section 10.04.

"Indemnifying Party" has the meaning set forth in Section 10.04.

"Intellectual Property" means any or all of the following and all rights, arising out of or associated therewith: (a) all U.S. and foreign patents and applications therefor and all reissues, reexaminations, inter parte reviews, post-grant reviews, covered business method reviews, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements, mask works, trade secrets, proprietary information, know-how, research and development, designs, plans, drawings, algorithms, formulas, technology, technical data and customer and vendor lists, and all documentation relating to any of the foregoing throughout the world; (c) all works of authorship (whether copyrightable or not), all copyrights, copyright registrations and applications therefor, all renewals, extensions, restorations and reversions thereof and all other rights corresponding thereto throughout the world; (d) all industrial designs and any registrations and applications therefor throughout the world; (e) all internet uniform resource locators, domain names, social media identifiers, names, tags, handles and profiles, trade names, logos, slogans, designs, trade dress, common law trademarks and service marks, source identifiers, trademark and service mark and trade dress registrations and applications therefor throughout the world, including all renewals of the same, and all goodwill related thereto; (f) all software, databases, data collections and data and all rights therein throughout the world; (g) all rights of publicity and privacy; (h) all moral and economic rights of authors and inventors, however denominated, throughout the world; and (i) any similar or equivalent rights to any of the foregoing anywhere in the world.

"Intellectual Property for Acquired Facility" has the meaning set forth in Section 4.13(a).

"Inspection Period" has the meaning set forth in Section 6.08(a).

"Inspections" has the meaning set forth in Section 6.08(a).

"Interim Period" has the meaning set forth in Section 6.01.

"Knowledge of Seller" means the knowledge of (including all facts known by) John Crites, II, Kelly Crites, Kelly Riddle and Tom Plaugher on the date hereof after reasonable inquiry and diligence with respect to the matters at hand.

"Laws" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, executive orders, decrees, approvals, directives, judgments, injunctions, writs, awards and decrees of, or issued by, any Governmental Entity.

"Lease" means any lease, sublease or license entered into by any Seller, as lessor or lessee, with respect to any Real Property.

"Leased Real Property" has the meaning set forth in Section 2.02(h).

"Legal Dispute" means any suit, litigation, action, claim, arbitration or proceeding between or among the Parties and their respective Affiliates arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

"Legal Proceeding" has the meaning set forth in Section 4.06.

"Liens, Claims and Encumbrances" mean all mortgages, liens, pledges, security interests, charges, claims (both in equity or at law), liabilities, causes of action, restrictions, deeds of trust, judgments, voting trusts, options, deposits, covenants, easements, rights of way, encroachments, rights of first refusal, leases, subleases, rights of use or possession, rights of offset, setoff, or recoupment, successor liability or other restrictions or encumbrances of any nature whatsoever with respect to the Acquired Assets, including any clouds on title, restrictions on use, transfer, voting, receipt of income or exercise of any other attribute of ownership in and to the Acquired Assets, any similar rights, and third-party interests or any other restrictions or limitations of any kind with respect to the Acquired Assets.

"Losses" means any loss, liability, demand, claim, Legal Proceeding, cause of action, cost, damage, deficiency, Tax, penalty, fine or expense, whether or not arising out of third-party claims (including interest, penalties, attorneys', accountants' and other professionals' fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing, whether in a dispute between any of the Parties or any third party)."Non-Assignable Asset" has the meaning set forth in Section 2.08.

"Non-Assignment Period" has the meaning set forth in Section 2.08.

"Objectionable Items" has the meaning set forth in Section 6.08(a).

"Objection Holdback Amount" has the meaning set forth in Section 6.08(a).

"Objection Holdback Release Date" has the meaning set forth in Section 6.08(a).

"Order" means any order, injunction, judgment, doctrine, decree, ruling, writ, assessment or arbitration award of a Governmental Entity.

"Original Agreement" has the meaning set forth in the recitals.

"Original Deposit Amount" has the meaning set forth in Section 3.02(a).

"OSHA" means the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq.

"Outside Date" has the meaning set forth in Section 9.01(e).

"Owned Real Property" has the meaning set forth in Section 2.02(g).

"Party" or "Parties" has the meaning set forth in the preamble.

"Permits" means any permits, licenses, franchises, consents, approvals, accreditations, authorizations, registrations, certificates, waivers, grants, easements, exceptions, endorsements, accounts, filings, concessions, Orders and other similar rights from any Governmental Entity.

"Permitted Liens, Claims and Encumbrances" means (a) Liens, Claims and Encumbrances for Taxes not yet due and payable, (b) statutory Liens, Claims and Encumbrances of landlords, (c) Liens, Claims and Encumbrances of carriers, warehousemen, mechanics, materialmen and repairmen incurred in the ordinary course and not yet delinquent that do not, individually or in the aggregate, have more than a *de minimis* effect on the Acquired Assets, and (d) covenants, conditions, restrictions, easements and other non-monetary Liens, Claims and Encumbrances affecting title to any Owned Real Property which do not and would not reasonably be expected to, individually or in the aggregate, materially impair the value, current use, occupancy or operation of such Owned Real Property.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, trust, association, joint stock company, unincorporated organization or Governmental Entity.

"Purchase Price" has the meaning set forth in Section 3.01.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Ancillary Documents" means any certificate, Contract, document or other instrument, other than this Agreement, to be executed and delivered by the Purchaser in connection with the transactions contemplated hereby.

"Purchaser Designee" means any Affiliate of the Purchaser designated by the Purchaser in writing as a purchaser of one or more of the Acquired Assets pursuant to Section 2.09.

"Purchaser Indemnified Parties" has the meaning set forth in Section 10.02.

"Purchaser Indemnifying Party" has the meaning set forth in Section 10.03.

"Purchaser Related Parties" has the meaning set forth in Section 9.03(a)(ii).

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 690l et seq.

"Real Property" has the meaning set forth in Section 2.02(h).

"Receiver" has the meaning set forth in the preamble.

"Receivership Case" has the meaning set forth in the preamble.

"Receivership Court" has the meaning set forth in the preamble.

"Receivership Estate" has the meaning set forth in the recitals.

"Receivership Order" has the meaning set forth in the recitals.

"Representatives" means, with respect to a Person, such Person's officers, directors, managers, employees, investment bankers, attorneys, accountants, consultants and other authorized agents, advisors or representatives.

"Restoration Cost" has the meaning set forth in Section 6.08(b).

"Sale Procedures Order" has the meaning set forth in Section 9.03(b)(iv).

"Sale Order" means the Order entered by the Receivership Court, substantially in a form reasonably acceptable to the Purchaser, the Receiver, and United in their respective sole discretion, approving this Agreement and the sale and transfer of the Acquired Assets to the Purchaser free and clear of any and all Liens, Claims and Encumbrances (other than Permitted Liens, Claims and Encumbrances) that existed at any time on or before the Closing Date.

"Schedule" means any schedule attached to this Agreement.

"Seller Ancillary Documents" means any certificate, Contract, document or other instrument, other than this Agreement, to be executed and delivered by the Receiver in connection with the transactions contemplated hereby.

"Seller Benefit Plan" means (a) each plan, fund, program, Contract, arrangement or scheme providing for employee benefits or for the remuneration, direct or indirect, of the current or former employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of such Person or the dependents of any of them (whether written or oral), including each employment agreement and deferred compensation, bonus, incentive compensation, pension, retirement, stock purchase, stock option, restricted stock and other equity-based compensation plan, Contract or arrangement; (b) each "welfare plan" (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA); (c) each "pension plan" (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is subject to ERISA); (d) each severance, retention or change in control plan or Contract, each plan or Contract providing health, vacation, paid time off, summer hours, fringe benefit, supplemental unemployment benefit, hospitalization insurance, medical, dental or legal benefit; and (e) each other employee benefit plan, fund, program, Contract, arrangement or scheme, whether funded or unfunded, in each case sponsored or maintained or required to be sponsored or maintained by any Seller or any of its ERISA Affiliates or to which any Seller or any of its ERISA Affiliates makes, or has any obligation to make, directly or indirectly, any

contributions or with respect to which any Seller or any of its ERISA Affiliates has, or might have, any liabilities (fixed, contingent or otherwise).

"Seller Related Parties" has the meaning set forth in Section 9.03(a)(ii).

"Seller Indemnified Parties" has the meaning set forth in Section 10.03.

"Seller Indemnifying Party" has the meaning set forth in Section 10.02.

"Seller Permits" means all Permits necessary to own, lease, hold or operate their respective Acquired Assets and for the operation of the Business as currently conducted and as conducted during the preceding twelve (12) month period.

"Supplier" means any supplier of the Business.

"Survival Date" has the meaning set forth in Section 10.01.

"Tax Return" means any report, return, claim for refund, declaration or other information return or statement required to be supplied to a Governmental Entity relating to Taxes, including any schedule or attachment thereto and any estimated returns and any amendment thereof.

"Taxes" means all taxes, assessments, charges, duties, fees, levies and other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, social contribution, unemployment compensation, unclaimed property or escheat, disability, transfer, sales, use, excise, license, occupation, registration, stamp, premium, environmental, customs duties, alternative or add-on minimum, estimated, gross receipts, value-added and all other taxes of any kind imposed by any Governmental Entity.

"Termination Fee" has the meaning set forth in Section 9.03(a)(i).

"Third-Party Claim" has the meaning set forth in Section 10.05(a).

"Title Company" has the meaning set forth in Section 7.02(d).

"Transaction Documents" means, collectively, this Agreement, the Purchaser Ancillary Documents and the Seller Ancillary Documents.

"Transaction Expenses" means the legal, accounting, financial advisory and other third party advisory or consulting fees and expenses incurred by any Seller or the Receiver, as applicable, in connection with the transactions contemplated hereby and not paid prior to the Closing Date.

"Transfer Taxes" has the meaning set forth in Section 6.06(b).

"Transferred Employee" has the meaning set forth in Section 6.05(a).

"Transition Services Agreement" has the meaning set forth in Section 7.02(b).

"Treasury Regulations" means the Treasury regulations promulgated under the Code, as such Treasury Regulations may be amended from time to time.

"TSCA" means the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.

"U.S." means the United States of America.

"United" shall have the meaning set forth in the recitals.

"Valuation Time" means 12:01 am Eastern time on the Closing Date.

Section 1.02.  **Construction**.  Unless the context of this Agreement otherwise clearly requires, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to one gender include the other gender, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement the terms "day" and "days" mean and refer to calendar day(s), (f) the terms "year" and "years" mean and refer to calendar year(s), (g) unless set forth specifically otherwise, the settlement of all payments hereunder shall be made in US Dollars, and (h) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if".  Unless otherwise set forth herein, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law means such Law as amended, modified, supplemented or succeeded, from time to time and in effect at any given time.  All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified. The titles, captions and table of contents contained herein are inserted herein only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

Section 1.03.  **Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## ARTICLE II
## PURCHASE AND SALE

Section 2.01.  **Agreement to Purchase and Sell**.  At the Closing, subject to the terms and conditions of this Agreement, and in consideration for the payment of the Purchase Price, and the assumption by the Purchaser of only the Assumed Liabilities, (a) the Receiver, on behalf of the

Sellers will, pursuant to the Sale Order, grant, sell, assign, transfer, convey and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Receiver, all right, title and interest of the Sellers in and to the Acquired Assets, free and clear of any and all Liens, Claims and Encumbrances (other than Permitted Liens, Claims and Encumbrances), and (b) the Purchaser shall assume only the Assumed Liabilities.

Section 2.02.  **Acquired Assets**.  Subject to the terms and conditions set forth herein and except as set forth in Section 2.03, the "Acquired Assets" shall include the following assets, properties and rights of the Sellers owned, used or held for use by the Sellers exclusively in connection with the Business or at the Acquired Facility (collectively the "Acquired Assets"):

(a) [RESERVED];

(b) [RESERVED];

(c) supplies and spare parts inventories, located at the Acquired Facility at the Closing;

(d) all motor vehicles and loaders set forth on Schedule 2.02(d);

(e) all fixed assets, machinery, equipment, tools, furnishings, computer hardware, office equipment and other tangible personal property, including those set forth on Schedule 2.02(e);

(f) all rights of the Sellers under the Assumed Contracts;

(g) all real property owned by the applicable Seller set forth on Schedule 2.02(g) (the "Owned Real Property") (which such schedule may be updated to reflect a metes and bounds description of each premises as depicted in any survey in such schedule as shall be reasonably approved by the Parties, or as otherwise reasonably requested by the Purchaser or the Title Company), in each case, together with all (A) right, title and interest in, to and under all facilities, buildings, structures, improvements and fixtures thereon, (B) easements and rights of way pertaining thereto or accruing to the benefit thereof and (C) other appurtenances pertaining thereto (collectively, the "Acquired Facility");

(h) all right, title and interest (including leasehold estates) of the Sellers in and to all real property leased, subleased, licensed, occupied or used by the applicable Seller set forth on Schedule 2.02(h) (the "Leased Real Property", and together with the Owned Real Property, the "Real Property") and the related Leases, including (x) any prepaid rent, security deposits and options to purchase in connection therewith and (y) any fixtures, structures or improvements appurtenant to the Leased Real Property, together with all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

(i) all information, files, correspondence (including e-mail), records, data, plans, reports and recorded knowledge, including supplier lists and other files, records and data related to suppliers, price and mailing lists, customer lists and other files, records and data related to customers, asset ledgers, personnel and employment records related to Transferred Employees, and all accounting or other books and records of the Acquired Assets listed above in whatever media retained or stored, including online storage, computer programs and disks and all rights of the Sellers in and to personal data, including those set forth on Schedule 2.02(i);

-11-

(j) all Seller Permits and all pending applications therefor or renewals thereof, in each case, to the extent transferable to the Purchaser and Purchaser elects to take an assignment of such Permit (the "Acquired Permits");

(k) all of the Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to the Acquired Assets or the Assumed Liabilities;

(l) phone numbers, to the extent attributable solely to the Acquired Facility;

(m) [RESERVED];

(n) all past rights, claims, credits, proceedings, causes of action (including Legal Proceedings), rights of recoupment or rights of set off against third parties to the extent arising out of the Acquired Assets or the Assumed Liabilities (and the right to receive all monies, proceeds, settlements and recoveries in connection therewith); and

(o) all other tangible and intangible assets, properties and rights of any kind or description, wherever located, that are set forth on Schedule 2.02(o).

**Section 2.03.  Excluded Assets**.  Notwithstanding anything to the contrary set forth in this Agreement, the Receiver shall not, and shall cause the Sellers not to, sell, convey, transfer, assign or deliver to the Purchaser hereunder any assets or properties other than the Acquired Assets (collectively, the "Excluded Assets"). Without limiting the generality of the foregoing, the Excluded Assets shall include any and all of the Sellers' right, title or interest in, to or under the assets, properties and rights set forth below:

(a) all rights with respect to any Employment Agreement to which a Seller is a party or under which a Seller has or may have any liability (fixed, contingent or otherwise), any Seller Benefit Plan, and any insurance policies;

(b) the charter documents of the Sellers, minute books, stock ledgers, Tax Returns (and related Tax records), other constituent records relating exclusively to the corporate organization, maintenance and existence of the Sellers;

(c) all Contracts that are not Assumed Contracts;

(d) each Seller's bank accounts on the Closing Date and all rights to any bank accounts of the Sellers;

(e) all accounts receivable and notes receivables (the "Accounts Receivable");

(f) all intercompany receivables owed to any Affiliate of a Seller or owed by any Affiliate of a Seller to such Seller;

(g) the assets and property listed on Schedule 2.03(g);

(h) all lumber inventory (lumber, mulch, raw logs, unprocessed lumber, work in process lumber, finished lumber, standing timber inventory, stocks, and similar), wherever located; and

(i)  the rights that accrue to the Sellers under the express terms of this Agreement or any other Seller Ancillary Document.

**Section 2.04.   Assumption of Assumed Liabilities**.

(a)  Except as provided in Section 2.04(b), the Purchaser shall not assume, in connection with the transactions contemplated hereby, any liability or obligation of any Seller whatsoever, and the Sellers shall retain responsibility for all liabilities and obligations accrued as of or on the Closing Date, and all liabilities and obligations arising from or relating to the Sellers' operations prior to or on the Closing Date, whether or not accrued and whether or not disclosed.

(b)  As the sole exception to the provisions in Section 2.04(a), the Purchaser shall assume only the following obligations of the Sellers (collectively, the "Assumed Liabilities"):

(i)    the obligations of the applicable Seller under each Assumed Contract to the extent such obligations (A) are not required to be performed on or prior to the Valuation Time, (B) accrue and relate to the ownership and use of the Acquired Assets at and after the Valuation Time, and (C) do not arise from any breach or default thereof or any failure to perform timely by the applicable Seller or that otherwise occurred or occurs before the Valuation Time; provided, that for all Assumed Liabilities, the Purchaser shall succeed to all rights, privileges, and, where applicable, defenses thereunder;

**Section 2.05.   Excluded Liabilities**.  Specifically, and without in any way limiting the generality of Section 2.04(a), the Assumed Liabilities shall not include, and in no event shall the Purchaser assume, agree to pay, discharge or satisfy any liability or obligation under this Agreement or otherwise have any responsibility for, any liability or obligation (together with all liabilities described in Section 2.04(a) (except as provided in Section 2.04(b)) and all other liabilities of the Sellers that are not Assumed Liabilities, the "Excluded Liabilities") set forth on Schedule 2.05 or arising from or related to any claim, action, cause of action, lawsuit, demand, investigation, audit, suit, dispute, proceeding, administrative or other enforcement proceeding or arbitration proceeding by or before any Governmental Entity or arbitrator relating to any or all of the foregoing and all costs and expenses in connection therewith.

**Section 2.06.   Further Assurances**.  Each Party shall on the Closing Date and from time to time thereafter, at any other Party's reasonable request and without further consideration, execute and deliver to such other Party such instruments of transfer, conveyance, and assignment as shall be reasonably requested to transfer, convey, and assign the Acquired Assets to the Purchaser and otherwise to effect the transactions contemplated by this Agreement.

**Section 2.07.   Successor Liability.**  Except as otherwise expressly provided herein, the Purchaser and the Purchaser's Affiliates do not assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of any Seller or any Seller's Affiliates or any other Person, including those relating to, resulting from or arising out of the

ownership or use of any Acquired Assets of any Seller or the operation of the Business by any Seller, arising prior to the Closing Date. The Purchaser and other Purchaser Related Parties are not, and shall not be, successors to any Seller or any Seller's Affiliates by any reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Purchaser shall assume only the Assumed Liabilities set forth in this Agreement. The Receiver, on behalf of the Sellers, acknowledges, stipulates, and agrees that this <u>Section 2.07</u> is a material provision of this Agreement in the absence of which the Purchaser would not have agreed to enter into this Agreement.

Section 2.08.  **<u>Non-Assignment</u>**.

Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign or transfer any Acquired Assets if an assignment or transfer thereof, without the consent of a necessary third party, would constitute a breach or other contravention thereof or would in any way adversely affect the rights of the Purchaser thereunder and such consent is not obtained at or prior to the Closing (any such Acquired Asset, a "<u>Non-Assignable Asset</u>"). Any assignment or transfer that requires such a third party consent shall be made subject to such consent being obtained. For a period of up to six (6) months following the Closing Date (the "<u>Non-Assignment Period</u>"), the Purchaser, on the one hand, and the Sellers and the Receiver, on the other hand, shall use commercially reasonable efforts to (a) obtain any consent necessary to transfer and assign any such Non-Assignable Asset and (b) enter into arrangements (such as subleasing, sublicensing or subcontracting arrangements) reasonably acceptable to the Purchaser and the Receiver (on behalf of itself and the Sellers) designed to provide the Purchaser with the economic benefit and, to the extent permitted under applicable Law, operational equivalent of the transfer of such Non-Assignable Asset and/or any Assumed Liability with respect thereto and for the Purchaser to pay, perform and discharge all services and obligations, and bear all costs and liabilities, of the applicable Seller under such Non-Assignable Asset. For so long as any Seller holds any Non-Assignable Asset pursuant to the immediately preceding sentence, (i) such Seller shall hold in trust for the benefit of the Purchaser and promptly pay to the Purchaser all monies received by such Seller in respect of any such Non-Assignable Asset or any claim or right or any benefit arising thereunder and (ii) the Purchaser shall promptly reimburse the Sellers for reasonable and documented out-of-pocket expenses incurred by the Receiver or any of the Sellers, as applicable. In the event that, following the Closing, the requisite consent to transfer and assign any Non-Assignable Asset is obtained, such Non-Assignable Asset shall be deemed to have been automatically assigned and transferred to the Purchaser as of the Closing and, otherwise on the terms set forth in this Agreement, for no further consideration.  In the event a consent is not obtained on or before the last day of the Non-Assignment Period, Receiver and Sellers shall be deemed to be in breach of this Agreement and Purchaser can pursue any available remedies under this Agreement.

Section 2.09.  **<u>Purchaser Designees</u>**. The Parties agree that, prior to the Closing, the Purchaser may (in its sole discretion) elect to assign its right to purchase certain Acquired Assets hereunder to one or more Purchaser Designees without the prior written consent of the Receiver or any of the Sellers; <u>provided</u>, <u>however</u>, that, notwithstanding any such assignment, the Purchaser shall remain liable for, and any assignment or execution of any Transaction Document shall not relieve the Purchaser of, its obligations hereunder or thereunder. In the event that the Purchaser elects to assign any such rights to a Purchaser Designee, the Purchaser shall promptly deliver

written notice thereof to the Receiver, which notice shall include the name of the relevant Purchaser Designee(s) and the Acquired Assets to be acquired by such Purchaser Designee(s) subject to the terms and upon the conditions hereof, and any reference to the Purchaser in this Agreement shall, to the extent applicable based on the Acquired Assets to be acquired by such Purchaser Designee, also be deemed a reference to the applicable Purchaser Designee, except where in context of this Agreement such use would not be appropriate.

## ARTICLE III
## PURCHASE PRICE

**Section 3.01.  Purchase Price**.  The aggregate cash amount to be paid for the Acquired Assets by the Purchaser (the "Purchase Price") shall be an amount equal to One Million Two Hundred Thousand Dollars ($1,200,000).  The Purchase Price shall be payable in accordance with Section 3.02. In addition to the Purchase Price, upon the terms and subject to the conditions herein, at the Closing, the Purchaser shall assume and discharge the Assumed Liabilities.

**Section 3.02.  Manner of Payments**.  The Purchase Price shall be paid by (or on behalf of) the Purchaser as follows:

(a)    Deposit Amount. The Parties hereby acknowledge that the Purchaser has paid to the Escrow Agent, by wire transfer of immediately available funds to such account specified by the Escrow Agent in writing Two Hundred Fifty Thousand Dollars ($250,000) (the "Original Deposit Amount") for the Escrow Agent to hold in a segregated account in escrow in accordance with the Escrow Agreement entered into with the Escrow Agent on July 22, 2024 (the "Escrow Agreement").  The Purchaser and the Receiver hereby agree that the Purchaser shall forfeit its rights with respect to, and the Receiver shall be entitled to One Hundred Fifty Thousand Dollars ($150,000) out of the Original Deposit Amount (the "Forfeited Deposit Amount") in full satisfaction of any and all claims under the Original Agreement, and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver the Forfeited Deposit Amount to the Receiver, by wire transfer of immediately available funds to an account designated in writing by the Receiver in accordance with the Escrow Agreement. On the date that this Agreement is executed by the Parties, the Purchaser shall pay to the Escrow Agent, by wire transfer of immediately available funds to such account specified by the Escrow Agent in writing One Hundred Seventy-Five Thousand Dollars ($175,000) (the "Additional Deposit Amount," together with the remainder of the Original Deposit Amount in the amount of One Hundred Thousand Dollars ($100,000), collectively the "Deposit Amount") for the Escrow Agent to hold in a segregated account in escrow in accordance with the Escrow Agreement. [1]The Deposit Amount shall be distributed as follows:

(i)    upon the terms and subject to the conditions set forth herein (including, without limitation, this Section 3.02(a)) and in the Escrow Agreement, at the Closing, the Deposit Amount shall be credited to the Purchaser and the Parties shall

---

[1] Note to Draft: the Escrow Agreement needs to be revised to reflect the change of the Escrow Fund thereunder.

jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Receiver, on behalf of the Purchaser (and in full satisfaction of its payment obligations with respect thereto), by wire transfer of immediately available funds to an account designated in writing by the Receiver, which amount shall be applied toward payment of the Purchase Price;

(ii)     if this Agreement is validly terminated by the Receiver or the Purchaser pursuant to Section 9.01(a), the Deposit Amount shall be credited to Purchaser and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Purchaser, by wire transfer of immediately available funds to an account designated in writing by the Purchaser in accordance with the Escrow Agreement;

(iii)    if this Agreement is validly terminated by the Purchaser pursuant to Section 9.01(b), the Deposit Amount shall be credited to Purchaser and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Purchaser, by wire transfer of immediately available funds to an account designated in writing by the Purchaser in accordance with the Escrow Agreement;

(iv)     if this Agreement is validly terminated by the Receiver pursuant to Sections 9.01(c)(i) and 9.01(c)(ii), the Deposit Amount shall be credited to Receiver and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Receiver, by wire transfer of immediately available funds to an account designated in writing by the Receiver in accordance with the Escrow Agreement; if this Agreement is validly terminated by the Receiver pursuant to Section 9.01(c)(iii), (A) the Original Deposit Amount minus the Forfeited Deposit Amount shall be credited to Receiver and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Receiver, by wire transfer of immediately available funds to an account designated in writing by the Receiver in accordance with the Escrow Agreement, and (B) the Additional Deposit Amount shall be credited to Purchaser and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Purchaser, by wire transfer of immediately available funds to an account designated in writing by the Purchaser in accordance with the Escrow Agreement;

(v)      if this Agreement is validly terminated by the Receiver or the Purchaser pursuant to Section 9.01(d), the Deposit Amount shall be credited to Purchaser and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Purchaser, by wire transfer of immediately available funds to an account designated in writing by the Purchaser in accordance with the Escrow Agreement;

(vi)     if this Agreement is validly terminated by the Receiver or the Purchaser pursuant to Section 9.01(e), the Deposit Amount shall be credited to Purchaser and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver

such amount to the Purchaser, by wire transfer of immediately available funds to an account designated in writing by the Purchaser in accordance with the Escrow Agreement, provided that, if Purchaser terminated this agreement pursuant to Section 9.01(e), but at the time of such termination, the Receiver was entitled to terminate this Agreement pursuant to Section 9.01(c)(i) (without limiting the requirement for delivery of written notice required thereunder and the expiration of any cure periods provided therein) or Section 9.01(c)(ii), then the Deposit Amount shall be credited to Receiver and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Receiver, by wire transfer of immediately available funds to an account designated in writing by the Receiver in accordance with the Escrow Agreement;

(vii)   if this Agreement is validly terminated by the Receiver or the Purchaser pursuant to Section 9.01(f), the Deposit Amount shall be credited to Purchaser and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Purchaser, by wire transfer of immediately available funds to an account designated in writing by the Purchaser in accordance with the Escrow Agreement; and

(viii)  if this Agreement is validly terminated by the Purchaser pursuant to Section 9.01(g), the Deposit Amount shall be credited to Receiver and the Parties shall jointly instruct the Escrow Agent in writing to promptly deliver such amount to the Receiver, by wire transfer of immediately available funds to an account designated in writing by the Receiver in accordance with the Escrow Agreement.

(b)   Closing Payment. At the Closing, the Purchaser shall pay to the Receiver, by wire transfer of immediately available funds to such account specified by the Receiver in writing Nine Hundred Twenty-Five Thousand Dollars ($925,000), subject to adjustments and prorations contained herein (the "Closing Payment").

**Section 3.03.   Withholding**. Notwithstanding anything in this Agreement to the contrary, each of the Receiver and the Purchaser shall be entitled to deduct and withhold, or cause to be deducted or withheld, from any amounts otherwise payable pursuant to this Agreement to any Person such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder, or any provision of state, local or foreign Tax Law.  Other than in regard to compensatory amounts subject to payroll reporting and withholding (if any), prior to such deduction or withholding, the withholding Party shall provide the other Party with written notice of its intent to withhold and the Parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by Law. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

**Section 3.04.   Allocation of Purchase Price**. Prior to the Closing, the Receiver and the Purchaser shall agree on allocation of the Purchase Price (including any liabilities or other items treated as consideration for federal income tax purposes) among the Acquired Assets (the "Allocation Schedule"), which shall comply with the Code and the Treasury Regulations

promulgated thereunder.  The Allocation Schedule shall be final and binding on each Party for all Tax purposes, and no Party shall take any Tax position inconsistent with the Allocation Schedule, except as required by a final "determination" within the meaning of Section 1313(a) of the Code. The Allocation Schedule shall not be binding on any party, or relevant for evidentiary purposes, to the Receivership Case as to the value of any asset for determining lien priority or required payments of the proceeds.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

The Receiver, on behalf of the Sellers only, hereby represents and warrants to the Purchaser as follows as of the date hereof and as of the Closing:

**Section 4.01.  Organization**.  Each Seller is duly organized, validly existing and in good standing under the Laws of the State of West Virginia, and has all requisite power and authority to own, lease and operate its properties and to carry on the Business as now being conducted and as conducted as of January 1, 2024 and May 31, 2024.

**Section 4.02.  Authorization**.  The Receiver has all necessary right, power and authority to execute and deliver this Agreement and the Seller Ancillary Documents, to perform his and the Sellers obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Ancillary Documents by the Receiver, the performance by the Receiver of his and the Sellers obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all required action on the part of the Receiver. This Agreement and the Seller Ancillary Documents have been duly executed and delivered by the Receiver and constitute the valid and binding agreement of the Receiver on behalf of himself and each of the Sellers, enforceable against the Receiver and each Seller in accordance with their terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

**Section 4.03.  Absence of Restrictions and Conflicts**.  The execution, delivery and performance by the Receiver of this Agreement and the Seller Ancillary Documents, the consummation of the transactions contemplated hereby and thereby, and the fulfillment of and compliance with the terms and conditions hereof and thereof, do not or will not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any Person the right to terminate, modify or cancel (a) any term or provision of the organizational documents of any Seller, (b) except as set forth on Schedule 4.03, any Assumed Contract or any Seller Permit, (c) any judgment, decree or order of any court or Governmental Entity or agency to which the Seller is a party or by which any Seller or any of the Acquired Assets are bound, or (d) any Law or arbitration award applicable to the Seller.  Except for the Sale Order, no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to any Governmental Entity is required with respect to any Seller or the Receiver in connection with the execution, delivery or performance by the Receiver and each

Seller to this Agreement or the Seller Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby.

**Section 4.04.  <u>Real Property</u>**.

(a) Except as set forth on <u>Schedule 4.04(a)</u>, the applicable Seller has good and marketable title in fee simple, to the surface of the Owned Real Property, and a valid leasehold interest in each Leased Real Property and there are no mortgages or other Liens, Claims and Encumbrances on any Real Property except for the Permitted Liens, Claims and Encumbrances.  All public utilities, including water, sanitary sewer, gas, electric, telephone and drainage facilities, give adequate service to the Real Property, and the Real Property has unlimited access to and from publicly dedicated streets, the responsibility for maintenance of which has been accepted by the appropriate Governmental Entity.  Complete and correct copies of all title opinions, surveys and appraisals in the Sellers' possession and any policies of title insurance and any PILOT or similar Tax incentive agreements currently in force with respect to each parcel of Owned Real Property have been delivered by the Sellers to the Purchaser.

(b) Except as set forth on <u>Schedule 4.04(b)</u> and to the Knowledge of Seller, no portion of the Real Property or any building or improvement located thereon, violates any Law, including any Law relating to zoning, building, land use, environmental, health and safety, fire, air, sanitation and noise control. Except for the Permitted Liens, Claims and Encumbrances, no Real Property is subject to (i) any decree or order of any Governmental Entity (or, to the Knowledge of Seller, threatened or proposed order) or (ii) any rights of way, building use restrictions, exceptions, variances, reservations or limitations of any nature whatsoever.  There are no parties in possession or occupation, or with any current or future right to possess or occupy, of any portion of the Real Property other than the applicable Seller.

(c) Except as set forth on <u>Schedule 4.04(c)</u>, the improvements, buildings, structures and fixtures on the Real Property have been maintained in accordance with normal industry practice, are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, in all material respects, and are materially adequate and suitable for the purposes for which they are presently being used.  Neither the whole nor any material portion of any Real Property has been damaged or destroyed by fire or other casualty. There is no condemnation, expropriation or similar proceeding pending or, to the Knowledge of Seller, threatened against any of the Real Property or any improvement thereon.

(d) Except as set forth on <u>Schedule 4.04(d)</u>, there are no agreements pursuant to which any third party is granted to right to sublease, license, use or occupy any Owned Real Property or portion thereof.

**Section 4.05.  <u>Title to Acquired Assets</u>**.  Except as set forth on <u>Schedule 4.05</u>, the applicable Seller has good and marketable title to (or has a valid leasehold interest in) all of the Acquired Assets, free and clear of all Liens, Claims and Encumbrances except Permitted Liens, Claims and Encumbrances.  Except as set forth on <u>Schedule 4.05</u>, the Acquired Assets constitute all of the material assets, rights and properties used solely in the operation of the Acquired Facility immediately prior to January 1, 2024 and May 31, 2024.  The Acquired Assets are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted,

in all material respects and are materially adequate and suitable for the purposes for which they are presently being used.  No Acquired Assets are used, owned or leased by any of any Seller's remaining facilities or business.

Section 4.06.  **Legal Proceedings**.  Except as set forth on Schedule 4.06, as it relates to the Acquired Assets, there is no suit, litigation, action, claim, charge, arbitration, mediation, proceeding, audit or investigation (a "Legal Proceeding") pending or, to the Knowledge of Seller, threatened against, relating to or involving any Seller before any Governmental Entity or arbitrator. Except as set forth on Schedule 4.06, no Seller is subject to any award, judgment, decree, injunction, rule or order of any Governmental Entity or arbitration panel with respect to any of the Acquired Assets.

Section 4.07.  **Compliance with Law; Permits**. Except as set forth on Schedule 4.07, the operation of the Business and each Seller is (and has been at all times during the past five (5) years) in compliance in all material respects with all applicable Laws applicable to the Acquired Assets, including their ownership and use.  Schedule 4.07 sets forth, to the Knowledge of Seller, a true, correct and complete list of all Seller Permits as of January 1, 2024 and May 31, 2024.  All Acquired Permits are and, during the past five (5) years, have been current and in full force and effect.  All Acquired Permits are in full force and effect. There is no pending or, to the Knowledge of Seller, threatened Legal Proceeding by or before any Governmental Entity that would reasonably be expected to result in the revocation or termination of any Acquired Permit.

Section 4.08.  **Material Contracts**.

(a) Section 4.08(a) sets forth, to the Knowledge of Seller, a true, correct and complete list of all material Contracts to which any Seller is or was a party or by which it or any of its properties or assets is or was as of January 1, 2024 and May 31, 2024 bound (the Contracts set forth or required to be set forth on Section 4.08(a), the "Material Contracts").  Correct and complete copies of all Material Contracts have been made available to the Purchaser.

(b) The Assumed Contracts are legal, valid, binding and enforceable in accordance with their respective terms with respect to the applicable Seller and each other party to such Assumed Contracts. Except as set forth on Schedule 4.08(b), there is no existing default or breach of any Seller under any Assumed Contract (or event or condition that, with notice or lapse of time or both could constitute a default or breach) and), to the Knowledge of Seller, there is no such default or breach (or event or condition that, with notice or lapse of time or both, could constitute a default or breach) with respect to any third party to any Assumed Contract. No Seller is participating in any discussions or negotiations regarding modification of or amendment to any Assumed Contract or entry in any new Contract that would be part of the Business and would constitute a Material Contract, except for Contracts related to the potential sale of standing timber inventory, including, without limitation, the sale of standing timber inventory at Pringle.

(c)      No Assumed Contract contains any deferred revenue or prepaid services.

Section 4.09.  **Tax Returns; Taxes**.   Except as otherwise disclosed on Schedule 4.09, with respect to the Sellers and the Acquired Assets: (a) all Tax Returns required to have been filed in accordance with any applicable Law have been duly and timely filed and are correct and

complete in all material respects; (b) all Taxes, deposits of Taxes or other payments relating to Taxes due and owing with respect to the Acquired Assets (whether or not shown on any Tax Return) have been timely paid in full; (c) all deficiencies asserted as a result of any examination of any Tax Returns of any Seller have been paid in full, accrued on the books of the applicable Seller or finally settled; (d) no claims have been asserted and no proposals or deficiencies for any Taxes of any Seller are being asserted, proposed or, to the Knowledge of Seller, threatened, and no audit or investigation of any Tax Return of such Seller is currently underway, pending or, to the Knowledge of Seller, threatened; (e) no claim has ever been made by a Taxing authority in a jurisdiction in which the applicable Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction; (f) Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holder or other third party; (g) No Seller is or has ever been a party to any ''reportable transaction,'' as defined in Section 6707A(c)(1) of the Code and Section 1.6011-4(b) of the Treasury Regulations; (h) Each Seller is and has, at all times been a validly electing S corporation within the meaning of Sections 1361 and 1362 of the Code and will not be liable for any Tax under Section 1374 of the Code (or any similar provision of state, local or foreign Tax Law) in connection with the transactions contemplated in this Agreement; (i) No Seller has received or applied for any "employee retention credit" within the meaning of Section 2301 of the CARES Act; (j) No Seller has ever applied for or received a loan or any other kind of indebtedness, subsidy, credit or other funds in connection with the Paycheck Protection Program under the CARES Act, the Paycheck Protection Program Flexibility Act of 2020 or any other program established or administered by a Governmental Entity (including, for the avoidance of doubt, the U.S. Small Business Administration); (k) Neither the Sellers nor the Purchaser will be required to pay, after the Closing Date, any Tax for any period (or portion of any straddle period) ending on or before the Closing Date as a result of the deferral of the payment of any Tax that, but for the CARES Act, would have been due on or prior to the Closing Date (and that was not paid on or prior to the Closing Date) or the advance on or prior to the Closing Date of any credit with respect to Taxes that, but for the CARES Act, would not have been available on or prior to the Closing Date, including, but not limited to, the delay of payment of employment Taxes under section 2302 of the CARES Act, the advance refunding of credits under Section 3606 of the CARES Act, and any delay in the payment of estimated Taxes; (l) there are no Liens, Claims and Encumbrances for Taxes against any Acquired Assets (other than Liens, Claims and Encumbrances for current Taxes which are not yet due and payable), nor are there any such Liens, Claims and Encumbrances for Taxes which are pending or, to the Knowledge of Seller, threatened; (m) no Seller has waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency; and (n) each Seller (A) has timely collected and paid all sales and use, value-added, goods and services, or similar Taxes that such Seller was required to collect or pay, and (B) is otherwise in compliance in all material respects with all applicable Laws regarding sales and/or use, value-added, goods and services, or similar Taxes.

Section 4.10.   Labor and Employment Matters; Benefit Plans.

(a) Schedule 4.10(a) contains a correct and complete list as of January 1, 2024 and May 31, 2024 (a) all of the employees of the Sellers who are primarily engaged by or provide services primarily to the Business (the "Business Employees"), specifying for each such individual, as applicable, (i) employing entity, (ii) job title, (iii) work location, (iv) status as exempt/non-exempt from the minimum wage and overtime requirements under applicable Law, (v) full-time/part-time

status, (vi) base salary or hourly rate, (vii) date of hire, (viii) union affiliation, if any, (ix) bonus or other incentive compensation eligibility, (x) total compensation for the prior calendar year, (xi) visa status, (xii) leave status and nature of leave, and (xiii) anticipated date of return from leave.

(b) None of the Sellers is a party to or bound by any collective bargaining agreement, Contract or legally binding commitment with any trade union or employee organization or group in respect of or affecting employees with respect to the Business. Each Seller is and, for the past five (5) years has been, in compliance in all material respects with all applicable Laws, Contracts, policies, plans and programs relating to labor relations, employment, and employment practices, including provisions relating to hiring, terminations, wages, hours, overtime compensation, equal opportunity, discrimination, harassment, retaliation, collective bargaining, occupational health and safety, immigration and employment eligibility authorization (including with respect to the requirements of the Immigration Reform Control Act of 1986), employee and independent contractor classification under applicable wage and hour Laws, meal and rest breaks, equal pay, leaves of absences, plant closures or mass layoffs (including with respect to the WARN ACT), workers' compensation, child labor, COVID-19, whistleblowing, disability rights or benefits, reasonable accommodation, worker training, working conditions, payment of social security and other Taxes and insurance.

(c) Except as set forth on Schedule 4.10(c), each employee, individual independent contractor or other service provider who has provided or is providing services to the Sellers in connection with the Business has been properly classified (i) as either (A) an employee or (B) an independent contractor, or other non-employee worker and (ii) for employees, as overtime exempt or non-exempt under all applicable Laws, including relating to wages and hours and Tax. Except as set forth on Schedule 4.10(c), the Sellers are not materially delinquent in payment of, nor have they failed to pay, in any material amount, any current or former employees of the Business, any wages (including minimum wage, overtime, meal breaks or waiting time penalties), salaries, fees, commissions, accrued and unused vacation, on-call payments, payments under a collective bargaining agreement, bonuses, benefits, profit sharing, stock options or other compensation, if any, for any services performed by them to which they would be entitled under applicable Law or agreement.

(d) Except as set forth on Schedule 4.10(d), there are and have been no pending or, to the Knowledge of Seller, threatened Legal Proceedings with respect to any former or current employee, independent contractor or other service provider, or applicant for employment with any Seller with respect to the Business that involves any alleged violation or breach by any Seller of any applicable Law.

(e) Except as set forth on Schedule 4.10(e), within the past three years, the Sellers have not implemented any layoffs or facility closures as it relates to the Business. Within the past three (3) years, the Sellers have not implemented any employee layoffs that gave rise to notice obligations under WARN or any similar Law. There has been no plant closing or mass layoff within the meaning of WARN or any similar Law for which any Seller has any unsatisfied liabilities.

(f) Schedule 4.10(f) contains a correct and complete list as of the date hereof of all Seller

Benefit Plans relating to the Business. Each Seller Benefit Plan of the Business has been established and administered in all material respects accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code and other applicable Laws. Except to the extent required by Section 4980B of the Code or applicable state law, no Seller Benefit Plan provides health care, welfare or any other non-pension benefits to any employees or other service providers after their employment or service is terminated, and the Sellers have never promised to provide such post-termination benefits. No Seller Benefit Plan with respect to the Business is subject to laws of a country other than the United States.

(g) Neither the Sellers nor any of their respective ERISA Affiliate has ever maintained or contributed, has had to or is reasonably expected to have any liability (whether contingent, fixed or otherwise), under or with respect to any "employee benefit plan" (as defined in Section 3(3) of ERISA) that is or was subject to Title IV of ERISA, Section 412 of the Code, Section 302 of ERISA, a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA), a "multiple employer welfare arrangement" (as defined in ERISA Section 3(40)) or a "multiple employer plan" (as described in Code Section 413(c) or ERISA Sections 4063 or 4064).

(h) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could (either alone or in conjunction with any other event) result in or cause (i) the accelerated vesting, payment, funding or delivery of, or increase the amount or value of, any payment or benefit to any current or former employee, officer, director or other service provider of the Sellers or (ii) any "excess parachute payment" (as such term is defined in Section 280G of the Code).

**Section 4.11.  Insurance Policies**.  Schedule 4.11 lists each insurance policy maintained by the applicable Seller with respect to the Business, including, in each case, policy number, amount and type of coverage.  Each Seller maintains, and has maintained, insurance coverage that is commercially reasonable in respect of the Business, and all of the insurance policies maintained, owned or held by such Seller as of the date hereof are valid and binding in accordance with their terms, and no coverage limit has been exhausted with respect to any such policy.

**Section 4.12.  Environmental Matters**.  Except as set forth on Schedule 4.12, with respect to the Acquired Assets:

(a) no notice, notification, demand, request for information, citation, summons or order has been received, no complaint has been filed, no penalty has been assessed and no action is pending, or to the Knowledge of Seller, threatened by any Governmental Entity or other Person with respect to any matters relating to or arising out of any Environmental Law;

(b) There are no liabilities arising under or relating to any Environmental Law, and there are no circumstances which could reasonably be expected to result in or be the basis for any such liability;

(c) No polychlorinated biphenyls, radioactive material, lead, asbestos-containing material, incinerator, sump, surface impoundment, lagoon, landfill, septic, wastewater treatment or other disposal system or underground storage tank (active or inactive) is or has been present at, on or under any property now or previously owned, leased or operated by any Seller;

(d) No Hazardous Material has been discharged, disposed of, dumped, injected, pumped, deposited, spilled, leaked, emitted or released at, on or under any property now or previously owned, leased or operated by any Seller;

(e) no property now or previously owned, leased or operated by any Seller with respect to the Acquired Assets is listed or, to the Knowledge of Seller, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, on CERCLIS (as defined in CERCLA) or on any similar federal, state or foreign list of sites requiring investigation or clean-up;

(f) each Seller is in compliance in all material respects with all Environmental Laws and has obtained and is in compliance with all permits required by Environmental Laws, and such permits are valid and in full force and effect and will not be terminated or impaired or become terminable, in whole or in part, as a result of the transactions contemplated by this Agreement; and

(g) there has been no environmental investigation, study, audit, test, review or other analysis conducted in relation to the Acquired Assets, which has not been made available to the Purchaser.

**Section 4.13.  Intellectual Property; IT Assets; Data Privacy**.

(a) Schedule 4.13(a) sets forth all issuances, registrations and applications pertaining to Intellectual Property owned (or purported to be owned) by or filed in the name of any Seller as of the date hereof, including domain names, to the extent required to operate the Acquired Facility (the "Intellectual Property for Acquired Facility"), and all such issued and registered Intellectual Property are subsisting, unexpired and, to the Knowledge of Seller, valid and enforceable. All Intellectual Property for Acquired Facility that is owned or purported to be owned by any Seller (the "Owned Intellectual Property for Acquired Facility") is exclusively owned by the applicable Seller, free and clear of all Liens, Claims and Encumbrances (other than Permitted Liens, Claims and Encumbrances). The applicable Sellers own and have the right to use, or have a valid and enforceable license or otherwise possess legally enforceable rights to use, all Intellectual Property for Acquired Facility included in the Acquired Assets.

(b) During the past five (5) years, no written claim has been brought or made by any third party against the Sellers with respect to the Intellectual Property for Acquired Facility (i) contesting the validity, enforceability or ownership of any of the Owned Intellectual Property for Acquired Facility or (ii) alleging that the operation of the Business infringes, misappropriates, dilutes or otherwise violates any third-party Intellectual Property, and, in the case of the preceding clauses (i) and (ii), to the Knowledge of Seller, no such claims are threatened. To the Knowledge of Seller, no Person is infringing, misappropriating, diluting or otherwise violating any Owned Intellectual Property for Acquired Facility. Neither the operation of the Business nor any of the Intellectual Property for Acquired Facility infringes upon, misappropriates, dilutes or otherwise violates any third-party Intellectual Property.  During the past three (3) years, the Sellers have taken commercially reasonable steps to ensure the confidentiality of any trade secrets included in the Owned Intellectual Property for Acquired Facility.

**Section 4.14.  Supplier Relations**.  Except as set forth on Schedule 4.14, (i) no event has occurred that could materially and adversely affect the Sellers relations with any Supplier; (ii) no

Supplier has during the last twelve (12) months cancelled, not renewed, terminated or, to the Knowledge of Seller, made any threat to cancel, not renew or otherwise terminate any of its Contracts with the Seller or to decrease its business with the Sellers; and (iii) the Sellers have no Knowledge of Seller to the effect that any current Supplier may terminate or materially alter its business relations with the Sellers, either as a result of the transactions contemplated hereby or otherwise.

Section 4.15.  **Transactions with Affiliates**.  Except as set forth on Schedule 4.15, no shareholder of any Seller, or Affiliate thereof, has any interest in (i) any Contract, arrangement or understanding with, or relating to, such Seller or the properties or assets of such Seller with respect to the Business; (ii) any loan, arrangement, understanding, agreement or Contract for or relating to the Business or (iii) any property (real, personal or mixed), tangible or intangible, used or currently intended to be used by the Seller as it relates to the Business.

Section 4.16.  **Brokers, Finders and Investment Bankers**.  Neither any Seller, nor any shareholder, officer, director or employee of any Seller, nor any Affiliate of any Seller, has employed any broker, finder or investment banker or other Person or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby, except as set forth on Schedule 4.16, provided that the Sellers are solely responsible for the fees and expenses of any such broker, finder or investment banker or other Person.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser hereby represents and warrants to the Receiver and the Sellers as follows as of the date hereof and as of the Closing:

Section 5.01.  **Organization**. The Purchaser is duly organized, validly existing and in good standing under the Laws of the State of West Virginia.

Section 5.02.  **Authorization**. The Purchaser has all corporate power and authority to execute and deliver this Agreement and the Purchaser Ancillary Documents, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The Purchaser's execution and delivery of this Agreement and the Purchaser Ancillary Documents, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all required action on the part of the Purchaser. This Agreement and the Purchaser Ancillary Documents have been duly executed and delivered by the Purchaser and constitute the valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 5.03.  **No Conflict**. The execution, delivery and performance by the Purchaser of this Agreement and the Purchaser Ancillary Documents, the consummation of the transactions

contemplated hereby and thereby, and the fulfillment of, and compliance with the terms and conditions hereof and thereof, do not or will not (as the case may be) (i) with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any Person the right to terminate, modify or cancel (a) any term or provision of the organizational documents of the Purchaser, (b) any judgment, decree or Order of any court or Governmental Entity or agency to which the Purchaser is a party or by which the Purchaser is bound, or (c) any Law or arbitration award applicable to the Purchaser. Except for the Sale Order, no consent, approval, order or authorization of, or registration, declaration or filing with, or notice to any Governmental Entity is required with respect to the Purchaser in connection with the execution, delivery or performance by the Purchaser of this Agreement or the Purchaser Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby.

**Section 5.04. <u>Legal Proceedings</u>**. There is no Legal Proceeding pending or, to the Purchaser's knowledge, threatened against or by the Purchaser that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement or any of the Purchaser Ancillary Documents. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal Proceeding against the Purchaser.

**Section 5.05. <u>Brokers, Finders and Investment Bankers</u>**. Neither the Purchaser, nor any shareholder, officer, director or employee of the Purchaser, nor any Affiliate or other Person on behalf of the Purchaser, has employed any broker, finder or investment banker or other Person who is entitled to any investment banking fees, financial advisory fees, brokerage fees or finder's fees or any similar fees or compensation, in each case, in connection with the transactions contemplated hereby, provided that Purchaser would be solely responsible for the fees and expense of such broker, finder, investment banker or other person.

**ARTICLE VI**
**CERTAIN COVENANTS AND AGREEMENTS**

**Section 6.01. <u>Access to Information</u>**.  During the period from the date of this Agreement to the earlier of the Closing or the valid termination of this Agreement in accordance with its terms (the "<u>Interim Period</u>"), the Receiver shall, and shall cause the Sellers to, provide to the Purchaser and its representatives reasonable access to the Business and the personnel, customers, suppliers, properties and books and records of the Sellers related to the Acquired Assets (including, where applicable, copies thereof); provided, that (a) such access does not unreasonably interfere with the normal business operations of the Sellers, (b) all requests for such access shall be directed to the Receiver or such other Person(s) as the Receiver may designate in writing from time to time, and (c) nothing herein shall require the Receiver to provide access to, or to disclose any information to, the Purchaser or any of its representatives to the extent such access or disclosure (i) is unrelated to the Acquired Assets, (ii) would waive any legal privilege, or (iii) would be in violation of applicable Laws or regulations of any Governmental Entity. Any information provided to the Purchaser or its representatives pursuant to this <u>Section 6.01</u> shall, to the extent applicable, be subject to the terms of that certain Non-Disclosure Agreement, dated as of September 2023 (as amended, the "<u>Confidentiality Agreement</u>"), by and among certain of the Sellers and Charles City Timber, which shall survive any termination of this Agreement in accordance with its terms but

-26-

shall terminate automatically at the Closing and be of no further force or effect. The execution of this Agreement constitutes written consent by the Receiver (on behalf of the Sellers) pursuant to the Confidentiality Agreement to all actions by the Purchaser, its Affiliates or any of its representatives expressly contemplated by or otherwise permitted under this Agreement. Charles City Timber is an intended third party beneficiary of this sentence and the two preceding sentences in this Section 6.01.

Section 6.02.    **Conduct of Business**.  During the Interim Period, except with the prior written consent of the Purchaser, the Receiver shall, and shall cause the Sellers to use commercially reasonable efforts to (i) preserve intact the current business organization and the assets and properties of the Business and (ii) not perform, authorize, commit or agree to take any of the following actions:

(a) effect any merger, consolidation, recapitalization, reclassification, stock or unit split or like change in its capitalization;

(b) sell, lease or otherwise transfer, or create or incur any Lien on, any of the Acquired Assets, other than (i) the sale of inventory in the ordinary course of business (provided, that the Receiver will provide notice to the Purchaser of any such material ordinary course of business dispositions that are not to the Purchaser or its Affiliates), or (ii) a sale pursuant to a Competing Bid;

(c) institute, settle, or offer or propose to settle any Legal Dispute involving or against the Business or the Acquired Assets or that relates to the transactions contemplated by this Agreement or the transactions contemplated hereby.

Section 6.03.  **Public Announcements**.  The Receiver will not, and will cause its Affiliates not to, issue or make any report, statement or release to the public (including employees, customers and suppliers of the Sellers) with respect to this Agreement or the transactions contemplated hereby without the consent of the Purchaser, unless required by Law, in which case the Purchaser shall have the right to review and comment on such press release or announcement prior to publication.

Section 6.04.  **Confidential Information**.  From and after the Closing, the Receiver shall, and shall cause the Sellers and each Seller's Affiliates to, hold in confidence at all times following the date hereof all Confidential Information and shall not disclose, publish or make use of such Confidential Information at any time following the date hereof without the prior written consent of the Purchaser. Notwithstanding the foregoing, in the event that the Receiver, any Seller or any Seller's Affiliates is requested or required by Law or legal process to disclose such Confidential Information, the Receiver shall promptly notify the Purchaser (prior to such disclosure to the extent reasonably practical and not prohibited by applicable Law) of such request or requirement so that the Purchaser may seek an appropriate protective order or other appropriate remedy; provided that the Receiver, any Seller or any of their respective Affiliates or Representatives, as applicable, may disclose the Confidential Information when and to the extent required, even if such protective order or other appropriate remedy has not been obtained.

**Section 6.05.   Employee Matters**.

(a)  The Receiver will terminate, conditioned on the Closing and effective as of the Closing Date, all of the employees listed on Schedule 4.10(a) (to the extent they are then employed by a Seller).  Purchaser (or its Affiliate) may elect to offer employment, conditioned on the Closing and effective as of the Closing Date, to all or any of such employees, provided that all hiring decisions shall be made by Purchaser in its sole discretion and nothing herein shall be deemed to obligate Purchaser to offer employment to any such person.  Any such person who receives and accepts an offer of employment with Purchaser or its Affiliate on or after the Closing Date is referred to herein as a "Transferred Employee".

(b) Purchaser will have no liability for any amounts due to any employee of the Business or any Seller (including any Transferred Employee) in connection with the termination of their employment by Receiver and/or any Seller.  The Sellers shall indemnify, defend and hold harmless the Purchaser from and against any and all claims, liabilities, losses, costs and expenses (including attorneys' fees) relating to, arising out of, or resulting from any and all obligations, liabilities and claims under the WARN Act or any similar Law, or COBRA Coverage, arising prior to or at the Closing with respect to the Business and all such claims, liabilities, losses, costs and expenses (including attorneys' fees) shall be Excluded Liabilities for all purposes hereunder.

(c) (i) The Purchaser shall not be obligated to assume, continue or maintain any of the Seller Benefit Plans, any workers' compensation plans or claims owed by any Seller to any current or former employees, or any bonus obligations or obligations for any accrued, unused paid time off; (ii) no assets or liabilities of the Seller Benefit Plans shall be transferred to, or assumed by, the Purchaser or the Purchaser's benefit plans; and (iii) the Sellers shall be solely responsible for funding or paying any benefits under any of the Seller Benefit Plans, including any termination benefits and other employee entitlements accrued under such plans by or attributable to employees of any of the Sellers and any of their respective ERISA Affiliates.

**Section 6.06.   Tax Matters**.

(a) Each of the Receiver and the Purchaser shall (and shall cause its respective Affiliates to) (i) furnish or cause to be furnished to each other such information and assistance relating to the Acquired Assets (including access to books and records) as is reasonably requested by any other Party for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax, (ii) cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Acquired Assets, (iii) timely sign and deliver such certificates or forms as may be reasonably necessary or appropriate to establish an exemption from (or otherwise reduce) any Transfer Taxes, and (iv) cooperate in the preparation, execution and filing of all Tax Returns, questionnaires, applications or other documents regarding any Transfer Taxes. For a period of five (5) years after the Closing Date, the Purchaser shall provide the Receiver with reasonable access, including the making of copies at the Receiver's expense, with all pre-Closing business and associated records with respect to the Acquired Assets reasonable necessary (i) to prepare and file Tax Returns or respond to any audit requests; and (ii)

and for any other reasonable purpose, including but not limited to, the defense or prosecution of litigation and responding to any inquiry of a Governmental Entity.

(b) All transfer, documentary, sales, use, stamp, value-added, registration and other such Taxes and fees ("Transfer Taxes"), including any penalties and interest, incurred in connection with the transactions contemplated hereby shall be paid by the Sellers when due.  The Receiver will, at his own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, the Purchaser will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

**Section 6.07.   Efforts; Receivership Court Approval.**

(a) Subject to the terms and conditions of this Agreement, during the Interim Period, each of the Parties shall use its commercially reasonable efforts to take or cause to be taken all actions, to file or cause to be filed all documents, to obtain or cause to be obtained all authorizations, consents, waivers, approvals, permits and orders from Governmental Entities and other Persons and to do or cause to be done all other things necessary, proper or advisable, in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article VIII). Without limiting the generality of the foregoing, the Parties agree to use commercially reasonable efforts to work together in good faith to obtain approval of this Agreement and entry by the Receivership Court of the Sale Order on or before the Outside Date.

(b) Prior to the Closing, the Receiver shall, in consultation with the Purchaser, (i) obtain the written consents and approvals to this Agreement and the consummation of the transactions contemplated hereby, each in form and substance reasonably satisfactory to the Purchaser, of the counterparties to the Assigned Contracts that the Purchaser designates in writing delivered to the Receiver within fifteen (15) Business Days following the date hereof, which, in the case of each consent and approval described in this clause (i) shall include a waiver and release of any termination or other similar rights of such counterparties based upon or related to the commencement of the Receivership Case, the Sellers having been placed in receivership or the financial condition or insolvency of any of the Sellers (the consents and approvals described in this clause (i), collectively, the "Required Consents"); and (ii) use commercially reasonable efforts to obtain all other consents, approvals, waivers and authorizations required to consummate the transactions contemplated hereby, each in form and substance reasonably satisfactory to the Purchaser; provided, however, that, in the case of clause (ii), the Receiver shall not be required to provide any financial accommodation in order to obtain any such consents or approvals.

**Section 6.08.   Real Property Matters.**

(a) Inspection of Acquired Facility. In furtherance, and not in limitation of Section 6.01, during the Interim Period, the Purchaser and its Representatives shall have the right to examine, inspect and investigate the Acquired Facility and perform such inspections and other examinations of the Acquired Facility that the Purchaser deems necessary or desirable (the "Inspections"), including any non-invasive tests, studies, investigations, inspections, assessments, and other examinations of physical and environmental conditions of the Acquired Facility, and to obtain

commitments for title insurance and ALTA/NSPS surveys for such properties, provided that, notwithstanding the foregoing, Purchaser and its Representatives shall have the right to perform any Phase II environmental assessments indicated by any Phase I environmental assessment. In the event that, at any time during the period beginning on the date of the Original Agreement and ending on the date that is ten (10) Business Days after the date of this Agreement (the "Inspection Period"), the Purchaser determines in its reasonable discretion that the results of its Inspections are unsatisfactory with respect to the Acquired Facility, the Purchaser shall have the right to elect, by written notice delivered to the Receiver prior to the expiration of the Inspection Period, to terminate this Agreement pursuant to Section 9.01(b)(iii). In the event that the Purchaser has not validly elected to terminate this Agreement prior to the expiration of the Inspection Period, then, upon the expiration thereof, the Deposit Amount shall be deemed to be non-refundable, subject to Section 3.02(a). Notwithstanding the foregoing, if, during the Inspection Period, the Purchaser determines in its reasonable discretion that there are any uninsurable title or survey defects or environmental issues for the Acquired Facility ("Objectionable Items"), the Purchaser shall notify the Receiver of such Objectionable Items and provide full reports related to such Objectionable Items to the Receiver, and the Receiver shall cure, or shall cause Sellers to cure, such Objectionable Items before the Closing Date (the "Cure Period"), provided that if the Receiver does not cure, or cause Sellers to cure, such Objectionable Items to the reasonable satisfaction of Purchaser within the Cure Period, at Closing, the sum of Sixty Thousand and no/100 Dollars ($60,000.00) (the "Objection Holdback Amount") will be withheld from the Purchase Price and held in escrow with the Escrow Agent. The Objection Holdback Amount shall be withheld until the later of (i) the date on which the Objectionable Items are cured in Purchaser's reasonable discretion, or (ii) six (6) months after the Closing Date (the "Objection Holdback Release Date"). In the event that, prior to the Objection Holdback Release Date, the Objectionable Items are cured, Escrow Agent shall disburse the Objection Holdback Amount to the Receiver upon written instruction from the Purchaser. If the Objectionable Items are not cured as provided herein on or before the Objection Holdback Release Date, then Escrow Agent shall refund the Objection Holdback Amount to the Purchaser. Notwithstanding the foregoing, if the cost to cure the Objectionable Items is equal to or greater than $100,000, the Receiver shall have the right to terminate this Agreement in accordance with Section 9.01(c)(iii).

(b) Casualty/Condemnation Loss. If, during the Interim Period, the Acquired Facility is physically damaged or destroyed by casualty or taken in condemnation or under right of eminent domain (each such event, a "Casualty/Condemnation Loss") and the cost of restoring, repairing or replacing such damaged, destroyed or taken Acquired Facility (together with any other assets and properties of the Sellers effected by the same Casualty/Condemnation Loss) to a condition reasonably comparable to its prior condition or the condemnation value, as applicable (in each case, net of and after giving effect to any insurance proceeds actually received by the Sellers for such restoration and used prior to the Closing Date) (and any other affected assets or properties of the Sellers) as determined by an independent qualified firm reasonably acceptable to the Purchaser and the Receiver, shall be the "Restoration Cost". the Receiver may elect to (i) reduce the amount of the Purchase Price by an amount equal to the estimated Restoration Cost (in each case, as estimated by an independent qualified firm reasonably acceptable to the Purchaser and the Receiver); or (ii) if it can reasonably be completed within five (5) Business Days prior to the Outside Date, restore, repair or replace the Acquired Facility (and any other affected assets or properties of the Sellers) relating to such Casualty/Condemnation Loss to a condition reasonably

comparable to their prior condition, in each case, by written notice to the Purchaser; provided, however, that, if the Restoration Cost is equal to or greater than $300,000, the Receiver or the Purchaser shall have the right to terminate this Agreement in accordance with Section 9.01(f). If the Receiver elects to restore, repair or replace the Acquired Facility (and any other affected assets or properties) pursuant to clause (ii) above, the Receiver will complete or cause to be completed, using commercially reasonable efforts, the repair, replacement or restoration of the damaged or taken assets or properties to a condition reasonably comparable to its prior condition prior to the Closing Date, and the Closing Date shall, subject to the other terms and conditions of this Agreement, be no earlier than the third (3rd) Business Day after such completion. If the Receiver does not make any such election upon the earlier of (x) fifteen (15) days after the date of such Casualty/Condemnation Loss or (y) five (5) Business Days prior to the Outside Date, it will be deemed to have elected to reduce the Purchase Price pursuant to clause (i) above, and, if the Restoration Cost is equal to or greater than $300,000, the Receiver or the Purchaser may terminate this Agreement pursuant to Section 9.01(f).  In the event of a Casualty/Condemnation Loss, the Receiver shall, and shall cause the Sellers to, use commercially reasonable efforts to collect amounts due (if any) under available insurance arrangements in respect of any such Casualty/Condemnation Loss and, if the Purchase Price is not reduced due to such Casualty/Condemnation Loss, the Receiver shall cause any such insurance proceeds received by the Sellers following the Closing (net of any insurance proceeds which reimburse costs and expenses incurred by the Sellers in respect of such Casualty/Condemnation Loss prior to the Closing) to be promptly paid to the Purchaser by wire transfer of immediately available funds to the account or accounts previously specified in writing by the Purchaser. To assist the Purchaser in its evaluation of any and all Casualty/Condemnation Losses (including Restoration Costs), the Receiver shall, and shall cause the Sellers to, provide the Purchaser such reasonable access to the properties of the Sellers and such information as the Purchaser may reasonably request in connection therewith, in each case in accordance with Section 6.01.

**Section 6.09.  Collection of Assets; Wrong Pockets.**

(a) As of and following the Closing, (i) the Purchaser shall have the right and authority to collect all assets and other items transferred and assigned to it as Acquired Assets by the Sellers hereunder and to endorse with any Seller's name any checks received on account of any such items. At or prior to the Closing, the Receiver shall deliver to the Purchaser a true and complete list of the Accounts Receivable. Following the Closing, the Receiver and the Sellers shall not, directly or indirectly, take any actions in connection with the collection of any such Accounts Receivable which would reasonably be expected to be, individually or in the aggregate, materially adverse to the continuing operations of the Business or the Purchaser (including by engaging any third-party collections agents in connection with the collection thereof).

(b) In the event that, at any time or from time to time after the Closing, the Receiver or any of the Sellers (or any of their respective Affiliates) receives or otherwise possesses any Acquired Asset or any other property or asset that belongs to the Purchaser pursuant to the express terms of this Agreement (including any payments in respect of the Business (other than any Excluded Asset or Excluded Liability) or any Acquired Asset or Assumed Liability), the Receiver shall, or shall cause the Sellers or the applicable Affiliate of the Sellers to, promptly (after becoming aware of the same) convey, assign, transfer and deliver, or cause to be conveyed, assigned transferred and

delivered, such asset to the Purchaser (or its designee) for no additional consideration.

(c)  In the event that, at any time or from time to time after the Closing, the Purchaser (or any of its Affiliates) receives or otherwise possesses any Excluded Asset or any other property or asset that belongs to the Sellers pursuant to the express terms of this Agreement (including any payments in respect of any Excluded Asset or Excluded Liability), the Purchaser shall, or shall cause its Affiliate to, promptly (after becoming aware of the same) convey, assign, transfer and deliver, or cause to be conveyed, assigned transferred and delivered, such asset to the Sellers (or their designee) for no additional consideration.

Section 6.10.  **Original Agreement**.  Other than as specifically stated in Section 3.02(a) with the respect to the deposit under the Original Agreement, the Original Agreement is hereby terminated and voided in all respects, the Parties hereby have no further rights or obligations under the Original Agreement and any claims under the Original Agreement are hereby waived and released in full.

### ARTICLE VII
### CLOSING

Section 7.01.  **Closing**.  Unless this Agreement is earlier terminated pursuant to Section 9.01, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on the tenth day following the satisfaction or waiver of the conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction of such conditions), which the Parties will work in good faith to cause to occur within ten (10) days of the entry by the Receivership Court of the Sale Order but no sooner than the end of the Inspection Period (the "Closing Date") by the delivery of executed documents and funds into escrow with the Title Company, on or before the Closing Date without the necessity of personal attendance by the Parties. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 am. (U.S. Eastern Time) on the Closing Date.

Section 7.02.  **Receiver Closing Deliveries**.  At the Closing, the Receiver shall deliver, or cause to be delivered, to the Purchaser the following:

(a)  the Sale Order entered by the Receivership Court;

(b)  the Bill of Sale and Assignment and Assumption Agreement in substantially the form attached as Exhibit A (the "Bill of Sale and Assumption Agreement"), executed by the Receiver;

(c)  a customary Transition Services Agreement in a form mutually agreed upon by Receiver and Purchaser that includes rights under applicable licenses necessary to operate equipment and machinery included in the Acquired Assets (to the extent permitted under applicable license agreements) as well as addressing additional issues customarily included in these types of agreements to the extent necessary to operate the Business (the "Transition Services Agreement"), executed by the Receiver, provided that the Purchaser determines that such agreement is needed for operation of the Business immediately following Closing;

(d) properly executed and acknowledged special warranty deeds for the Owned Real Property, which, notwithstanding anything to the contrary in this Article VII, shall be delivered on or before the Closing Date to Fidelity National Title Insurance Company, Attn: Pam Faber, Esq., 7130 Glen Forest Drive, Suite 300, Richmond, Virginia 23226 (the "Title Company"), and shall have been reasonably approved by Purchaser and the Title Company, together with (i) an owner's affidavit and gap indemnity for the Acquired Facility, in the form required by the Title Company; (ii) evidence reasonably satisfactory to the Title Company of the Receiver's and/or the Sellers' due organization and due authorization and execution of this Agreement and the other Seller Transaction Documents; (iii) any Tax or withholding forms required in connection with recordation of the Deeds; and (iv) any affidavits or other transfer documents reasonably requested by the Title Company;

(e) a certificate of Tax clearance with respect to each Seller issued by the applicable Governmental Entity in each of the State of West Virginia and the Commonwealth of Pennsylvania, which certifies that no Tax is then due in such jurisdiction;

(f) a properly completed and executed Internal Revenue Service Form W-9 of each Seller;

(g) physical possession of all physical and tangible materials included in the Acquired Assets; provided that any such Acquired Assets that, as of the Closing Date, are physically located at the Acquired Facility or Leased Real Property included in the Acquired Assets shall be deemed to have been so delivered;

(h) executed copies of all Required Consents;

(i) vehicle titles for each owned vehicle included in the Acquired Assets, each duly endorsed to Purchaser;

(j) an updated Accounts Receivable Schedule pursuant to Section 6.09(a);

(k) [RESERVED]; and

(l) all other documents required to be entered into by the Receiver pursuant hereto or reasonably requested by the Purchaser to convey the Acquired Assets to the Purchaser or to otherwise consummate the transactions contemplated hereby.

**Section 7.03. Purchaser Closing Deliveries.** At the Closing, the Purchaser shall deliver, or cause to be delivered, to the Receiver the following:

(a) the Closing Payment to be paid at Closing pursuant to Section 3.02(b), paid and delivered in accordance with such Section;

(b) the Bill of Sale and Assumption Agreement, executed by the Purchaser;

(c) the Transition Services Agreement, executed by the Purchaser, provided that the Purchaser determines in its sole but reasonable discretion that such agreement is needed for operation of the Business immediately following Closing;

(d) [RESERVED]; and

(e) all resolutions adopted by the management of the Purchaser authorizing the execution, delivery and performance of this Agreement and the Purchaser Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 7.04.  Prorations**.  At the time of Closing, prorations shall be made for ad valorem, real estate and other property taxes, business and license fees, and utility expenses, in each case with respect to the Acquired Assets, based on the number of days in the applicable Tax or billing period prior to the Closing Date (which shall be apportioned to the Sellers) and the number of days in the applicable Tax or billing period following (and including) the Closing Date (which shall be apportioned to Purchaser).

## ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.01.  Conditions to Obligations of the Purchaser**.  The obligation of the Purchaser to consummate the Closing is subject to the satisfaction as of the Closing or waiver by the Purchaser of the following conditions:

(a) The representations and warranties in Article IV shall be true and correct in all material respects as of the Closing Date (other than such representations and warranties as are made as of another date, which shall be true and correct in all material respects as of such date);

(b) The Receiver and the Sellers shall not be in material breach of any covenant or agreement contained in this Agreement that the Receiver or any Seller was required to perform prior to or at the Closing;

(c) No Order shall be in effect as of the Closing that restrains, prohibits or makes illegal the consummation of the transactions contemplated by this Agreement;

(d) The Sale Order shall have been entered by the Receivership Court, in a form and substance acceptable to the Purchaser and in accordance with the Receivership Order and applicable Law;

(e) The Receiver shall have delivered to the Purchaser each of the documents (in forms reasonably acceptable to the Purchaser) listed in Section 7.02;

(f) The Purchaser has received assignment of (including any necessary notices, consents or other approvals) or obtained in its own name all Acquired Permits; and

(g) The Purchaser has received the following: (i) ALTA/NSPS surveys for the Owned Real Property, in the form reasonably acceptable to the Purchaser; and (ii) written confirmation of the Title Company's irrevocable commitment to issue an ALTA Owner's Policy of Title Insurance for the Owned Real Property (subject only to the payment of the premium therefor), insuring the Purchaser's fee simple interest in such Owned Real Property, subject only to the Permitted Liens, Claims and Encumbrances applicable to each.

**Section 8.02.  Conditions to Obligations of the Receiver.** The obligation of the Receiver (on behalf of the Sellers) to consummate the Closing is subject to the satisfaction as of the Closing or waiver by the Purchaser of the following conditions:

(a)  The representations and warranties in Article V shall be true and correct in all material respects as of the Closing Date (other than such representations and warranties as are made as of another date, which shall be true and correct in all material respects as of such date).

(b)  The Purchaser shall not be in material breach of any covenant or agreement contained in this Agreement that the Purchaser was required to perform prior to the Closing;

(c)  No Order shall be in effect as of the Closing that restrains, prohibits or makes illegal the consummation of the transactions contemplated by this Agreement; and

(d)  The Purchaser shall have delivered to the Receiver each of the deliverables listed in Section 7.03.

## ARTICLE IX
## TERMINATION

**Section 9.01.  Termination.**  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)  by the mutual written consent of the Purchaser and the Receiver;

(b)  by the Purchaser by written notice to the Receiver:

    (i)  if there has been a violation or breach by either the Receiver or any Seller of any covenant, representation or warranty contained in this Agreement which, if not cured, would (if the Closing were to then otherwise occur) prevent the satisfaction of any condition to the obligations of the Purchaser at the Closing set forth in Section 8.01 (and such violation or breach has not been waived by Purchaser in writing);

    (ii)  if the Receiver enters into a definitive agreement for the purchase of all or any portion of the Acquired Assets with any other Person (other than the Purchaser or any of its Affiliates), including if the Receiver accepts a Competing Bid; or

    (iii)   if, at any time during the Inspection Period, the Purchaser elects to terminate this Agreement pursuant to and in accordance with Section 6.08(a);

(c)  by the Receiver by written notice to the Purchaser:

    (i)  if there has been a violation or breach by the Purchaser of any covenant, representation or warranty contained in this Agreement which, if not cured, would (if the Closing were to then otherwise occur) prevent the satisfaction of any condition to

the obligations of the Receiver at the Closing set forth in <u>Section 8.02</u> (and such violation or breach has not been waived by the Receiver in writing);

(ii)   if (A) all the conditions set forth in <u>Section 8.01</u> have been satisfied or waived (other than (x) the condition set forth in <u>Section 8.01(e)</u> and (y) those conditions that by their terms are to be satisfied by deliveries at the Closing, each of which would be satisfied if the Closing Date were the date that the notice contemplated by the following clause (B) is delivered by the Receiver to the Purchaser), (B) the Receiver has irrevocably confirmed by written notice to the Purchaser, on or prior to the date on which the Closing is required to occur pursuant to <u>Section 7.01</u>, that the Receiver and the Sellers are ready, willing and able to, and will, complete the transactions contemplated hereby and (C) the Purchaser fails to consummate the transactions contemplated hereby on or prior to the third (3rd) Business Day following the later of (x) the delivery of such notice and (y) the date on which the Closing is required to occur pursuant to <u>Section 7.01</u>; or

(iii)   if the Receiver elects to terminate this Agreement pursuant to and in accordance with Section 6.08(a);

(d) by the Purchaser or the Receiver, if the Receivership Court, shall have issued an Order, or any other Law or Order, in each case, having the effect of permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby;

(e) by the Purchaser or the Receiver, if any of the transactions contemplated by this Agreement have not been consummated on or prior to October 1, 2024 (or such other later date as the Parties and United may mutually agree in writing prior to such date, the "<u>Outside Date</u>"), <u>provided</u> that neither the Purchaser nor the Receiver shall be entitled to terminate this Agreement pursuant to this <u>Section 9.01(e)</u> if such Party is in breach in any material respect of its obligations under this Agreement and such breach is the primary cause of the failure of the Closing to occur prior to the Outside Date;

(f) by the Purchaser or the Receiver, if a Casualty/Condemnation Loss has occurred for which the Restoration Cost is equal to or greater than $300,000;

(g) by the Purchaser for any reason or no reason.

**Section 9.02.   <u>Effect of Termination</u>.**   In the event of any valid termination of this Agreement by the Purchaser or the Receiver as provided in <u>Section 9.01</u>, this Agreement shall forthwith become void and of no further force or effect, and there shall be no further liability or obligation on the part of any Party to any other Party with respect to this Agreement; provided, that (i) this <u>Section 9.02</u>, <u>Section 6.04</u>, <u>Section 9.03</u> and <u>Article XI</u> shall survive the termination of this Agreement and shall be enforceable by the Parties, and (ii) subject to <u>Section 9.03</u>, no such termination shall relieve any Party from liability for any fraud.

**Section 9.03.   <u>Termination Fee; Break-Up Fees</u>.**

(a) <u>Termination Fee</u>.

(i)      If this Agreement is terminated (i) by the Receiver pursuant to <u>Section 9.01(c)(i) or Section 9.01(c)(ii)</u>, (ii) by the Purchaser pursuant to <u>Section 9.01(e)</u> if, at the time of such termination, the Receiver would have been entitled to terminate the Agreement pursuant to <u>Section 9.01(c)(i)</u> (without limiting the requirement for delivery of written notice required thereunder and the expiration of any cure periods provided therein) or <u>Section 9.01(c)(ii)</u> or (iii) by the Purchaser pursuant to <u>Section 9.01(g)</u>, the Receiver shall be entitled to be paid the Deposit Amount (the "<u>Termination Fee</u>") in accordance with the immediately following sentence, it being understood that in no event shall the Receiver be entitled to the Termination Fee on more than one occasion (whether from Purchaser or otherwise). In the event the Termination Fee is payable pursuant to this <u>Section 9.03(a)(i)</u>, then the Purchaser shall automatically forfeit any rights with respect to, and the Receiver shall be entitled to payment of the Deposit Amount in accordance with <u>Section 3.02(a)(iv)</u>, which, for all purposes hereunder, shall be in full satisfaction of the obligations of the Purchaser with respect to the Termination Fee.

(ii)      In the event of termination of this Agreement, the Receiver's right to receive payment of the Termination Fee, to the extent payable in accordance herewith, shall be the sole and exclusive remedy of the Receiver, the Sellers and its subsidiaries, if any (collectively, the "<u>Seller Related Parties</u>") against the Purchaser and any of its Affiliates (including, for the avoidance of doubt, any Purchaser Designees), or Representatives (collectively, the "<u>Purchaser Related Parties</u>") for any and all Losses suffered or incurred by any Seller Related Party in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereunder and thereunder. Notwithstanding anything herein to the contrary, in no event shall any of the Receiver or any other Seller Related Party be entitled to seek or obtain any recovery or judgment in excess of the Termination Fee against any of the Purchaser Related Parties or any of their respective assets, and in no event shall the Receiver or any other Seller Related Party be entitled to seek or obtain any other damages or remedy of any kind (including without limitation specific performance) against any Purchaser Related Party for, or with respect to, this Agreement, the other Transaction Documents and the transactions contemplated hereunder and thereunder, including any breach by the Purchaser, the termination of this Agreement, the failure to consummate the transactions contemplated hereby or any claims or actions under applicable Law or otherwise arising out of any such breach, termination or failure; <u>provided</u> that nothing in this <u>Section 9.03(a)(ii)</u> shall relieve any of the Purchaser Related Parties from liability for any fraud prior to termination.

(b) <u>Break-Up Fees</u>.

(i)      If one or more Persons (other than the Purchaser and its Affiliates) acquires (whether by merger or consolidation, purchase of assets or Equity Interests of the Sellers or otherwise and including, for the avoidance of doubt, as part of a sale transaction), all or substantially all of the Acquired Facility, then the Receiver shall, or shall cause the Receivership Estate to, pay to the Purchaser, an amount in cash equal to Fifty Thousand Dollars ($50,000) (the "<u>Break-Up Fee</u>").

In the event that the Break-Up Fee is payable pursuant to this <u>Section 9.03(b)(i)</u>, the Receiver shall cause such amount to be paid to the Purchaser (or its designee) from the sale proceeds payable to the Receiver or the Sellers at the closing of the related sale transaction, by wire transfer of immediately available funds substantially concurrently with such closing (but, in any event, within two (2) Business Days following the date of such closing).

(ii)     If this Agreement is terminated by the Receiver pursuant to Section 9.01(f), then the Receiver shall, or shall cause the Receivership Estate to, pay to the Purchaser the Break-Up Fee by wire transfer of immediately available funds within five (5) Business Days following the date of such termination.

(iii)     Notwithstanding anything to the contrary herein, (A) in no event shall the Receiver be required to pay the Break-Up Fee on more than one occasion; and (B) in the event this Agreement is terminated under circumstances in which the Break-Up Fee is payable pursuant to <u>Section 9.03(b)(i)</u> or <u>Section 9.03(b)(ii)</u>, the Purchaser's right to receive payment of the Break-Up Fee, as applicable, together with the refund of the Deposit Amount pursuant to <u>Section 3.02(a)</u>, shall be the sole and exclusive remedy of the Purchaser Related Parties against the Seller Related Parties for any and all Losses suffered or incurred by any and all Purchaser Related Parties in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereunder and thereunder; provided, however, that nothing in this <u>Section 9.03(b)(iii)</u> shall relieve any of the Receiver and Sellers from liability for any fraud prior to termination.

(iv)     For the avoidance of doubt, provided the conditions set forth in <u>Section 3.02(a)</u> are met, distribution of the Deposit Amount to the Purchaser pursuant to <u>Section 3.02(a)</u> is still required notwithstanding whether the Break-Up Fee is due to the Purchaser.

(v)     The Parties hereby acknowledge that, after execution of this Agreement by the Parties, the Receiver will file a motion with the Receivership Court seeking an Order approving the procedures though which the Receiver will determine the highest or otherwise best price for the sale of the Acquired Assets and as described in this Agreement (the "<u>Sale Procedures Order</u>"), in accordance to which, (x) the Receiver may consider certain higher or better competing bids with respect to any transaction (or series of transactions) involving the sale of all or substantially all of the Acquired Assets to any Person (other than the Purchaser or any of its Affiliates) (each such bid, a "<u>Competing Bid</u>"); and (y) nothing contained in this Agreement shall be construed as prohibiting the Receiver from soliciting, considering or negotiating, agreeing to or otherwise taking action in furtherance of any Competing Bid, in each case, in accordance with the Sale Procedures Order; <u>provided</u> that, for the avoidance of doubt, the Receiver shall remain responsible for the payment obligations to the Purchaser with respect to any Break-Up Fee set forth in this <u>Section 9.03(b)</u> and any Deposit Amount set forth in <u>Section 3.02(a)</u>.

(c)   <u>Acknowledgements</u>. The Parties hereby acknowledge and agree that (i) the agreements contained in this <u>Section 9.03</u> are an integral part of the transactions contemplated by this Agreement, and without these agreements, the Parties would not enter into this Agreement; and (ii) each of the Termination Fee and the Break-Up Fee is not a penalty, but is liquidated damages, in a reasonable amount that will compensate the Receiver (on behalf of itself and

the Sellers) or the Purchaser, as the case may be, in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

**ARTICLE X**
**INDEMNIFICATION**

**Section 10.01. <u>Survival</u>**. The representations and warranties set forth in <u>Article IV</u> and <u>Article V</u> shall survive the Closing and the consummation of the transactions contemplated hereby and continue in full force and effect through the date that is nine (9) months after the Closing Date. All covenants and undertakings contained in this Agreement that by their terms are to be performed at or prior to the Closing shall survive Closing until the two (2) year anniversary of the Closing Date and all covenants, agreements and undertakings contained in this Agreement that by their terms are to be performed after the Closing shall survive until fully discharged in accordance with this Agreement. The date on which any representation, warranty, covenant or agreement expires hereunder is referred to herein as the "<u>Survival Date</u>". No claim may be made for indemnification hereunder for breach of any representation, warranty, covenant or agreement set forth in this Agreement after the applicable Survival Date of such representation, warranty, covenant or agreement set forth above; <u>provided</u> that if proper written notice of any indemnification claim for any such breach of any representation, warranty, covenant or agreement is delivered in accordance with this <u>Article X</u> prior to applicable Survival Date, such claim (together with any applicable representation, warranty, covenant or agreement with respect to such claim) shall survive until finally determined in accordance herewith. For the avoidance of doubt, the Parties hereby acknowledge and agree that the survival periods set forth in this <u>Section 10.01</u> are contractual statutes of limitations and any claim brought by any Party pursuant to this <u>Article X</u> must be brought or filed prior to the expiration of the applicable survival period.

**Section 10.02. <u>Indemnification by Sellers</u>**. Subject to the terms of this <u>Article X</u>, from and after the Closing, Sellers and the Receiver (acting on behalf of the Sellers, the "<u>Seller Indemnifying Party</u>") shall defend, indemnify and hold harmless the Purchaser, its Affiliates and its and their respective owners and other Representatives (collectively, the "<u>Purchaser Indemnified Parties</u>"), from and against, and shall reimburse the Purchaser Indemnified Parties for, any and all Losses suffered, sustained, incurred paid or required to be paid by any Purchaser Indemnified Party that is based upon, arises out of, results from or is related to:

(a)    any inaccuracy in or breach of any of the representations or warranties contained in <u>Article IV</u>;

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Receiver or Sellers pursuant to this Agreement; or

(c)    any Excluded Asset or Excluded Liability, including any liabilities or obligations that becomes, or is alleged to have become, a liability of the Purchaser under any applicable bulk sales Law or doctrine of successor liability or transferee liability, which, pursuant to <u>Section 2.07</u>, shall be treated as Excluded Liabilities regardless of the fact that liability may be

-39-

imposed upon the Purchaser under any applicable Law or otherwise by operation of Law.

**Section 10.03. Indemnification by Purchaser**. Subject to the terms of this Article X, from and after the Closing, the Purchaser (acting on behalf of itself and the Purchaser Designee, if any, the "Purchaser Indemnifying Party") shall defend, indemnify and hold harmless the Receiver, the Sellers, their respective Affiliates, and its and their respective owners and other Representatives (collectively, the "Seller Indemnified Parties"), from and against, and shall reimburse the Seller Indemnified Parties for, any and all Losses suffered, sustained, incurred paid or required to be paid by any Seller Indemnified Party that is based upon, arises out of, results from or is related to:

(a) any inaccuracy in or breach of any of the representations or warranties contained in Article V;

(b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Purchaser pursuant to this Agreement; or

(c) any Acquired Asset or Assumed Liability, provided that such Losses do not arise from or relate to the operation of the Business prior to Closing or any action or inaction by any Seller.

**Section 10.04. Limitations on Indemnification**. The party making a claim under this Article X is referred to as the "Indemnified Party," and the party against whom such claims are asserted under this Article X is referred to as the "Indemnifying Party." The indemnification provided for in Section 10.02 and Section 10.03 shall be subject to the following limitations:

(a)    The aggregate amount of all Losses for which an Indemnifying Party shall be liable pursuant to Section 10.02(a) or Section 10.03(a), as the case may be, shall not exceed 10% of the Purchase Price (the "Cap").  For clarity, any Losses that a Seller Indemnifying Party is liable for (subject to the Cap) shall be paid through a refund of the Purchase Price.

(b)    Payments by an Indemnifying Party pursuant to Section 10.02(a) or Section 10.03(a) in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received by the Indemnified Party in respect of any such claim (less collection costs and insurance premium increases arising therefrom).

(c)    In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive damages unless awarded to a third party.

None of the foregoing limitations shall apply in this case of fraud.

**Section 10.05. Indemnification Claim Procedures**.

(a)    Delivery of Claim Notice. In the event that an Indemnified Party (i) receives written notice of the assertion of any claim or the commencement of any Legal Proceeding by a third party, against such Indemnified Party that may give rise to a claim for indemnification hereunder (any such claim, a "Third-Party Claim") with respect to which the applicable Indemnifying Party may have liability under this Article X or (ii) becomes aware of facts that would reasonably be excepted to give rise to any claim by such

Indemnified Party on account of any Losses as to which the Indemnifying Party may have liability under this <u>Article X</u> and which do not result from a Third-Party Claim (a "<u>Direct Claim</u>"), and elects to make a claim thereof against the Indemnifying Party, such Indemnified Party shall promptly (but, in any event, within thirty (30) days) following receipt of such notice or determination thereof, as applicable, provide written notice of such Third-Party Claim or Direct Claim, as applicable, to the Indemnifying Party (any such notice, a "<u>Claim Notice</u>"). Any such Claim Notice shall (A) to the extent then known, describe in reasonable detail the facts and circumstances that give rise to such claim for indemnity and (B) to the extent known and quantifiable, include a summary of the Losses for which the Indemnified Party claims to be entitled to hereunder; <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall not limit the indemnification rights of the Indemnified Parties under this <u>Article X</u>, except to the extent the Indemnifying Party is actually prejudiced by such failure.

(b)    <u>Third-Party Claims</u>. In the event of any Third-Party Claim, (i) the Indemnified Parties shall have the sole power and authority to conduct and control the defense, negotiation and settlement of any Third-Party Claim and consent to the entry of any judgment or enter into any settlement with respect to, such Third-Party Claim in any manner such Indemnified Parties may reasonably deem appropriate, subject to the prior written consent of the Indemnifying Party (such consent not to be unreasonably withheld, conditioned or delayed); <u>provided</u> that the Indemnifying Party shall nevertheless have the right to participate in (but not control) the defense of such Third-Party Claim and, at its own expense, to employ counsel of its own choosing for such purpose; (ii) the Indemnifying Party shall promptly and periodically (but, in any event, at least quarterly) reimburse the applicable Indemnified Parties for the costs and expenses incurred in connection with the defense of such Third-Party Claim (including reasonable attorneys' fees and expenses); and (iii) the Indemnifying Party shall remain responsible for any and all Losses of the applicable Indemnified Parties with respect to such Third-Party Claim to the fullest extent provided in this <u>Article X</u>. The Indemnifying Party shall (and shall cause the Sellers to) cooperate with the Indemnified Parties and their respective Representatives in all reasonable respects in order to ensure the proper and adequate defense of a Third-Party Claim, including by, upon the reasonable request of the Indemnified Parties, providing reasonable access to its relevant books and records to the extent reasonably related to the matters to which the applicable indemnification claim relates and by making relevant current or former personnel and advisors of the Indemnifying Party reasonably available on a mutually convenient basis during normal business hours to provide additional information and explanation of any material provided hereunder.

(c)    <u>Direct Claims</u>. In the event of any Direct Claim, the Indemnifying Party may, within thirty (30) days after receipt of any such notice with respect to a Direct Claim, deliver to the Indemnified Party a written response disputing such claim, which response must state in reasonable detail the basis for such dispute, together with reasonable supporting detail to the extent available. If the Indemnifying Party fails to deliver a proper dispute notice with such thirty (30)-day period, the Indemnifying Party shall be deemed to have conceded and irrevocably waived its right to dispute any Direct Claim set forth in such claim notice, subject to the other applicable terms and conditions of this <u>Article X</u>. If the Indemnifying Party timely delivers a proper dispute notice, then the Indemnified Party

and the Indemnifying Party shall attempt in good faith to resolve any such disputes for a period of thirty (30) days (or such longer period as such Persons may agree in writing) and, if the Indemnified Party and the Indemnifying Party fail to resolve any such disputed claims within such period, the Indemnified Party shall be free to pursue any legal remedies as may be available to such Indemnified Party.

**Section 10.06. Payment of Claims**. Following the delivery by the applicable Indemnified Party of any Claim Notice, the amount of Losses (if any) for which such Indemnified Party shall be entitled to recover under this Article X (the "Indemnifiable Losses") shall be finally determined, subject to the other applicable limitations set forth in this Article X, by (a) written agreement between the  applicable Indemnified Party and the Indemnifying Party; (b) a final, non-appealable judgment or decree of any Chosen Court or, in the case of any Third-Party Claim, the settlement thereof in accordance with Section 10.05(b); or (c) in the case of any Direct Claim, the deemed acceptance of the Indemnifying Party if such claim is not timely disputed in accordance with Section 10.05(c). In the event that, based on any such final determination of an indemnity claim, any Indemnifiable Losses are determined to be payable to any of the Purchaser Indemnified Parties, none of the Receiver, the Sellers or any of their respective Representatives shall be liable for any Indemnifiable Losses in excess of Two Hundred Fifty Thousand Dollars ($250,000).  For the avoidance of doubt, no limitations set forth in this Agreement shall apply in the case of a claim based on fraud.

**Section 10.07. Reserved**.

**Section 10.08. Tax Treatment of Indemnification Payments**. Any indemnification payments made (or deemed to be made) pursuant to this Article X shall be treated, to the fullest extent permitted under applicable Law, as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by law.

**Section 10.09. Exclusive Remedy**. Notwithstanding anything to the contrary herein, except (a) in the case where a Party seeks to obtain specific performance or other equitable relief pursuant to Section 11.14, (b) for claims for fraud and (c) for claims under or related to any of the other Transaction Documents, from and after the Closing, the sole and exclusive remedy (if any) available to the Parties, and any Persons claiming by or through any such Party (including the Indemnified Parties), with respect to any and all claims relating to the subject matter of this Agreement and the transactions contemplated hereby shall be under the indemnification provisions set forth in this Article X.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**Section 11.01. Notices**.  Any notices or other communications required or permitted hereunder shall be deemed to have been properly given and delivered if in writing by such Party and delivered personally or sent by email transmission or nationally recognized overnight courier service guaranteeing overnight delivery or by registered or certified mail (return receipt requested) (with postage and other fees prepaid), addressed as follows:

| | |
|---|---|
| <u>To the Purchaser</u>: | RiverKing Lumber Products, Inc. |
| | c/o Patrick C. Evelyn |
| | 9245 Old Church Road |
| | New Kent, Virginia 23124 |
| | Attn:   Patrick C. Evelyn |
| | Email: pevelyn@verizon.net |
| | |
| <u>with a copy to</u>: | Williams Mullen |
| | 222 Central Park Avenue, Suite 1700 |
| | Virginia Beach, VA 23462 |
| | Attn:   Benjamin C. Crumpler |
| | Email: bcrumpler@williamsmullen.com |
| | |
| <u>To the Seller or the Receiver</u>: | Suttle & Stalnaker PLLC |
| | 1411 Virginia Street East |
| | Suite 100 |
| | Charleston, WV 25301 |
| | Attention: Christopher DeWeese |
| | Email: cdeweese@suttlecpas.com |
| | |
| <u>with a copy to</u>: | Stinson LLP |
| | 100 South Ashley Drive |
| | Suite 500 |
| | Tampa, FL 33602 |
| | Attention: Marc Weintraub |
| | Email: marc.weintraub@stinson.com |
| | |
| | Supple Law Office |
| | 801 Viand Street |
| | Point Pleasant, WV 25550 |
| | Attention: Joe Supple |
| | Email: joe.supple@supplelawoffice.com |

or to such other representative or at such other address of a Party as such Party may furnish to the other Parties in writing.  Any such notice, communication or delivery shall be deemed given or made (a) on the date of delivery, if delivered in person or email transmission, (b) on the first Business Day following timely delivery to a national overnight courier service or (c) on the fifth Business Day following it being mailed by registered or certified mail.

Section 11.02. <u>**Schedules and Exhibits**</u>.    The Schedules and Exhibits are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein.

Section 11.03. <u>**Assignment; Successors in Interest**</u>.   No assignment or transfer by any Party of such Party's rights and obligations hereunder shall be made except with the prior written consent of the other Parties; provided that the Purchaser shall, without the obligation to obtain the prior written consent of any other Party, be entitled to assign this Agreement or all or any part of

its rights or obligations hereunder to one or more Affiliates of the Purchaser or to its lenders for collateral purposes (in which each case the Purchaser nonetheless shall remain responsible for the performance of all of their obligations hereunder).  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns, and any reference to a Party shall also be a reference to the successors and permitted assigns thereof.

**Section 11.04. Controlling Law; Amendment**.  This Agreement shall be governed by and construed and enforced in accordance with the internal Laws of the State of West Virginia without reference to its choice of law rules.  This Agreement may not be amended, modified or supplemented except by written agreement of the Parties.

**Section 11.05. Consent to Jurisdiction, Etc.**.  Each Party hereby irrevocably consents and agrees that any Legal Dispute shall be brought only to the exclusive jurisdiction of the Receivership Court, and each Party hereby consents to the jurisdiction of such court (and of the appropriate appellate courts therefrom) in any such Legal Dispute and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Legal Dispute in any such court or that any such Legal Dispute that is brought in any such court has been brought in an inconvenient forum.  During the period a Legal Dispute is pending before a court, all Legal Disputes with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each Party hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such Party is not subject thereto, (b) such Legal Dispute may not be brought or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such Legal Dispute is brought in an inconvenient forum or (e) the venue of such Legal Dispute is improper.  A final judgment in any Legal Dispute described in this Section 11.05 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws.

**Section 11.06. Severability**.  Any provision hereof that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by Law, each Party hereby waives any provision of Law that renders any such provision prohibited or unenforceable in any respect.

**Section 11.07. Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or the terms hereof to produce or account for more than one of such counterparts.  Delivery of an executed counterpart of a signature page to this Agreement by electronic imaging means, including email transmission by PDF, shall be effective as delivery of a manually executed counterpart to this Agreement.

**Section 11.08. Enforcement of Certain Rights**.  Subject to Section 11.15, nothing expressed or implied herein is intended, or shall be construed, to confer upon or give any Person other than the Parties, and their successors or permitted assigns, any right, remedy, obligation or

liability under or by reason of this Agreement, or result in such Person being deemed a third-party beneficiary hereof.

Section 11.09. <u>Waiver</u>.  Any agreement on the part of a Party to any extension or waiver of any provision hereof shall be valid only if set forth in an instrument in writing signed on behalf of such Party.  A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty.  A waiver by any Party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

Section 11.10. <u>Integration</u>.  This Agreement and the documents executed pursuant hereto supersede all negotiations, agreements and understandings among the Parties with respect to the subject matter hereof and constitute the entire agreement among the Parties with respect thereto.

Section 11.11. <u>Cooperation Following the Closing</u>.  Following the Closing, each Party shall cooperate with the other Party to the extent reasonably possible, shall deliver to the other Party such further information and documents and shall execute and deliver to the other Party such further instruments and agreements, in each case as the other Party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to the other Party the benefits hereof.

Section 11.12. <u>Transaction Costs</u>.  Except as provided above or as otherwise expressly provided herein, (a) the Purchaser shall pay its own fees, costs and expenses incurred in connection herewith and the transactions contemplated hereby, including the fees, costs and expenses of its financial advisors, accountants and counsel, and (b) the Receiver, acting on behalf of itself and Sellers, shall pay its own fees, costs and expenses incurred in connection herewith and the transactions contemplated hereby, including the fees, costs and expenses of its financial advisors, accountants and counsel.

Section 11.13. <u>Waiver of Jury Trial</u>.  Each Party acknowledges and agrees that any Legal Dispute that may arise under this Agreement is likely to involve complicated and difficult issues, and therefore it hereby irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any Legal Dispute.

Section 11.14. <u>Specific Performance</u>.

The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that, subject to <u>Section 9.03(a)</u>, the Parties shall be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement without proof of damages, this being in addition to any other remedy to which they are entitled under this Agreement. The Parties agree not to assert that a remedy of monetary damages would provide an adequate remedy or that the Parties otherwise have an adequate remedy at law. The Parties further acknowledge and agree that no Party seeking any remedy described in this <u>Section 11.14</u> shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any such remedy, and each Party irrevocably waives

any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.  Notwithstanding anything to the contrary, the provisions in this <u>Section 11.14</u> are in all cases subject to <u>Section 9.03(a)</u>, which, among other things, limits recovery and remedies against Purchaser Related Parties and their respective assets.

Section 11.15. **No Third-Party Beneficiaries**. Except for (a) the last three sentences of <u>Section 6.01</u>, which shall be for the benefit of, and enforceable by, Charles City Timber, (b) <u>Article X</u>, which shall be for the benefit of, and enforceable by, the Indemnified Parties and (c) Section 11.16, which shall be for the benefit of, and enforceable by, the Non-Recourse Parties, this Agreement is for the sole benefit of the Parties (including, if applicable, any Purchaser Designees) and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 11.16. **No Recourse**. All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement and the transactions contemplated hereby, may only be brought against the Persons that are expressly identified as parties in the preamble to this Agreement (including, to the extent applicable, any Purchaser Designees) (each, a "<u>Named Party</u>"), including any successors or permitted assigns thereof. Except to the extent a Named Party, no past, present or future equityholder, member, partner, manager, director, officer, employee, Affiliate, financing sources, agent or other Representative of any Named Party (collectively, the "<u>Non-Recourse Parties</u>"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or the transactions contemplated hereby or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach of this Agreement and the transactions contemplated hereby, and, to the maximum extent permitted by Law, each Party hereby waives and releases all such liabilities, claims, causes of action and obligations against any such Non-Recourse Parties; <u>provided</u>, <u>however</u>, that nothing herein shall affect any liabilities or obligations of (a) any Person under any Transaction Document to which such Person is a party or (b) any claims in the event of fraud. The provisions of this Section are intended to be for the benefit of, and enforceable by the Non-Recourse Parties referenced in this Section and each such Person shall be a third party beneficiary of this Section.

**\* \* \* \* \***

       **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed, as of the date first above written.

                   **PURCHASER:**

                   RiverKing Lumber Products, Inc., a West Virginia corporation

                   DocuSigned by:

                   *Patrick C. Evelyn*

            By: ____89EAF2C4B3264A3..._____

               Name: Patrick C. Evelyn
               Title: President

                   **RECEIVER:**

            By: _____

               Christopher DeWeese,
               solely in his capacity as
               court-appointed Receiver of
               Allegheny Wood Products, Inc.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed, as of the date first above written.

**PURCHASER:**

RiverKing Lumber Products, Inc., a West Virginia corporation

By: _____
    Name: Patrick C. Evelyn
    Title: President

**RECEIVER:**

By: _____
    Christopher Deweese,
    solely in his capacity as
    court-appointed Receiver of
    Allegheny Wood Products, Inc.

Signature page of Asset Purchase Agreement

Exhibit A

## **FORM OF BILL OF SALE AND ASSUMPTION AGREEMENT**

(See Attached)

*Execution Version*

### GENERAL ASSIGNMENT AND BILL OF SALE

This GENERAL ASSIGNMENT AND BILL OF SALE (this "***Agreement***"), dated as of [●], 2024 (the "***Closing Date***"), is made and entered into by and between RiverKing Lumber Products, Inc., a West Virginia limited liability company (the "***Purchaser***") and Christopher DeWeese, solely in his capacity as the receiver (the "***Receiver***") appointed by the United States District Court for the northern District of West Virginia (the "***Receivership Court***") in the case styled United Bank v. Allegheny Wood Products, Inc. et al, Case No. 2:24-cv-00003-TSK (the "***Receivership Case***") for, and on behalf of , Allegheny Wood Products, Inc., a West Virginia corporation, Allegheny Wood Products International, Inc., a West Virginia corporation, and Allegheny Wood Timber Products, LLC, a West Virginia limited liability company (collectively, the "***Sellers***"). The Purchaser, the Receiver and the Sellers shall be referred herein from time individually to time as a "***Party***" and collectively as the "***Parties***".

### RECITALS

WHEREAS, The Purchaser and the Receiver have entered into that certain Amended and Restated Asset Purchase Agreement, dated as of [●], 2024 (the "***Purchase Agreement***");

WHEREAS, pursuant to the Purchase Agreement, the Receiver has agreed, on behalf of the Sellers, to sell, assign, transfer and convey to the Purchaser all right, title and interest in the Acquired Assets, and the Purchaser has agreed to purchase and acquire from the Receiver, free and clear of all Liens other than Permitted Liens, Claims and Encumbrances, the Purchased Assets, and in connection therewith, the Purchaser has agreed to assume, and to perform and satisfy, as and when due, only the Assumed Liabilities, in each case, upon the terms and subject to the conditions set forth in the Purchase Agreement;

WHEREAS, the Receivership Court has approved the Purchase Agreement and the sale and transfer of the Acquired Assets to the Purchaser and entered into the Sale Order in connection therewith, and the other closing conditions have been satisfied or waived by the applicable Party; and

WHEREAS, the Parties intend to reflect the conveyance and assignment of the Purchased Assets and the assumption of the Assumed Liabilities by the execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the premises, and the mutual representations, warranties, covenants and agreements hereinafter set forth, the Parties agree as follows:

1.    <u>Defined Terms</u>. Unless otherwise defined herein, capitalized terms used herein that are defined in the Purchase Agreement shall have the meanings ascribed to them in the Purchase Agreement.

2.    <u>Conveyance</u>. Effective as of 12:01 a.m. U.S. Eastern Time on the Closing Date (the "***Effective Time***") but conditioned upon the Closing, the Receiver, on behalf of the Sellers, hereby sells, assigns, transfers and conveys to the Purchaser, all of the Sellers' right, title and interest in and to the Acquired Assets free and clear of all liens, claims and encumbrances, other than Permitted Liens, Claims and Encumbrances, in accordance with the Purchase Agreement.

3.      <u>Assumption</u>. As of the Effective Time but conditioned upon the Closing, the Purchaser hereby assumes, agrees to perform and satisfy as and when due, all of the Assumed Liabilities, in accordance with the Purchase Agreement. The Purchaser assumes no liabilities of Sellers other than the Assumed Liabilities.  The Purchaser shall not assume any of the Excluded Liabilities, all of which shall be retained, paid, performed, discharged and satisfied by the Receiver and Sellers.

4.      <u>Purchase Agreement</u>. This Agreement is subject in all respects to the terms and conditions of the Purchase Agreement and does not (i) create any additional obligations, covenants, agreements, representations or warranties or alter, amend, modify, replace, change, rescind, waive, exceed, expand, enlarge, supersede or in any way affect any of the obligations, covenants, agreements, representations or warranties of any party thereto; or (ii) expand upon or limit the respective rights, benefits, responsibilities and obligations of any party thereto. In the event the terms of this Agreement conflict with the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern.

5.      <u>Non-Assignable Assets</u>. The transactions contemplated hereby will not constitute an assignment, transfer or conveyance of any Non-Assignable Assets. Any such Non-Assignable Assets shall be assigned, transferred and conveyed upon the terms and subject to the conditions set forth in the Purchase Agreement; provided, however, that notwithstanding anything to the contrary herein, in the event that following the Closing any Non-Assignable Assets become assignable, this Agreement shall apply *mutatis mutandis* to such Non-Assignable Assets without any further action on the part of any Party.

6.      <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, any one of which need not contain the signature of more than one (1) Party, but all such counterparts taken together shall constitute one and the same instrument.

7.      <u>Notices</u>. Any notice, request or other document to be given hereunder to any of the Parties shall be given in the manner prescribed in Section 11.01, *Notices*, of the Purchase Agreement.

8.      <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement is determined to be invalid, illegal or unenforceable under applicable Law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as (a) the economic or legal substance of the transactions contemplated hereby is not affected any manner materially adverse to any Party and (b) none of the provisions of Section 9.02 (*Effect of Termination*), Section 9.03 (*Termination Fee; Break-Up Fees*), Section 11.14 (*Specific Performance*) and Section 11.16 (*No Recourse*) of the Purchase Agreement are affected in any manner adverse to any Purchaser Related Party. Upon such determination that any term or other provision is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible

9. <u>Successors and Assigns</u>. No assignment or transfer by any Party of such Party's rights and obligations hereunder shall be made except with the prior written consent of the other Parties; <u>provided</u> that notwithstanding the foregoing, the Purchaser may at any time and without the consent of the Receiver (a) assign this Agreement, or any of its rights or obligations hereunder, to any of its Affiliates; (b) collaterally assign any of its rights under this Agreement to its lenders, other financing sources or administrative or collateral agents on behalf of the foregoing; or (c) assign this Agreement, or any of its rights or obligations, under this Agreement to any subsequent purchaser of the Purchaser or any of its divisions or any material portion of its assets (whether such sale is structured as a sale of equity, sale of assets, merger, recapitalization or otherwise); <u>provided</u>, <u>however</u>, that no such assignment shall relieve the Purchaser of any of its obligations hereunder. Subject to the immediately preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. Any attempted assignment in violation of this Section 9 shall be void.

10. <u>Controlling Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the internal Laws of the State of West Virginia, without giving effect to any choice or conflict of law provision or rule (whether of the State of West Virginia or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of West Virginia.

11. <u>Consent to Jurisdiction</u>. Each Party hereby irrevocably consents and agrees that any Legal Proceeding with respect to this Agreement and the rights and obligations arising hereunder, the transactions contemplated hereby or for recognition and enforcement of any judgment in respect of any of the foregoing brought by the other Party or its successors or permitted assigns, shall be brought and determined exclusively in the Receivership Court, and each Party hereby consents to the jurisdiction of such court (and of the appropriate appellate courts therefrom) (the "<u>Chosen Courts</u>"). Each of the Parties hereby irrevocably submits with regard to any such Legal Proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the Chosen Courts and agrees that it shall not bring any such Legal Proceeding in any court other than the Chosen Courts. Each of the Parties hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such Legal Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the Chosen Courts, (b) any claim that it or its property is exempt or immune from the jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by Law, any claim that (i) the Legal Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such Legal Proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Each Party irrevocably consents to service of process inside or outside the territorial jurisdiction of the Chosen Courts. Nothing in this Agreement shall affect the right of any Party to serve process on the other Parties in any manner permitted by applicable Law.

12. <u>Amendment</u>.  This Agreement may not be amended, modified or supplemented except by written agreement of the Parties.

13. <u>Miscellaneous</u>. Section 1.02 (*Construction*), Section 11.09 (*Waiver*), Section 11.12 (*Transaction Costs*), Section 11.13 (*Waiver of Jury Trial*) and Section 11.14 (*Specific*

*Performance*) of the Purchase Agreement are specifically incorporated herein by reference and shall apply *mutatis mutandis* to this Agreement.

[*Signature Pages Follow*]

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Agreement as of the date first above written.

<u>**PURCHASER**</u>**:**

**RIVERKING LUMBER PRODUCTS, INC.,**
A West Virginia corporation

By: _____
Name: Patrick C. Evelyn
Title:   President and Chief Executive Officer

**RECEIVER**:

_____

Christopher DeWeese, as the court appointed
Receiver of the Sellers

*Execution Version*

# SCHEDULES

These Schedules (these "Schedules") have been prepared in connection with the Amended and Restated Asset Purchase Agreement (the "Agreement"), dated as of September 4, 2024, by and between RiverKing Lumber Products, Inc., a West Virginia corporation (the "Purchaser"), and Christopher DeWeese, solely in his capacity as receiver (the "Receiver") appointed by the United States District Court for the Northern District of West Virginia (the "Receivership Court") in the case styled *United Bank v. Allegheny Wood Products, Inc. et al*, Case No. 2:24-cv-00003-TSK (the "Receivership Case") for, and on behalf of, Allegheny Wood Products, Inc., a West Virginia corporation, Allegheny Wood Products International, Inc., a West Virginia corporation, and Allegheny Wood Timber Products, LLC, a West Virginia limited liability company (collectively, the "Sellers"), and constitutes the Schedules referred to in the Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

All section, subsection or schedule references set forth herein correspond to the respective sections or subsections set forth in the Agreement. An exception or qualification set forth in these Schedules with respect to a particular section or subsection of the Agreement will be deemed to be disclosed with respect to all other applicable sections or subsections of this Agreement to the extent it is reasonably apparent on its face that such exception of qualification is also applicable to such other representation or warranty or section or subsection of the Agreement, notwithstanding the omission of an appropriate cross-reference to such section or subsection of the Agreement or the absence of a cross-reference to such subpart, section or subsection of these Schedules in such section or subsection of the Agreement. Headings and subheadings have been inserted herein for convenience of reference only and shall not have the effect of amending or changing the express description hereof as set forth in the Agreement.

The inclusion of any information (including dollar amounts) in any section of these Schedules shall not be deemed to be an admission or acknowledgment by the Receiver, on behalf of the Sellers, to that such information is required to be listed in such section or is material to or outside the ordinary course of the business of the Sellers, nor shall such information be deemed to establish a standard of materiality (and the actual standard of materiality may be higher or lower than the matters disclosed by such information). In addition, matters reflected in these Schedules are not necessarily limited to matters required by the Agreement to be reflected in the Schedules. Any such additional matters are set forth for informational purposes only and do not necessarily include (and shall not be deemed to include) other matters of a similar nature. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein or therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including, without limitation, any violation of applicable law or breach of contract).

**Schedule 1.01(a)**
**Assumed Contracts\***

1.  Arcules Camera System Licenses and Subscriptions*

2.  Cisco Meraki Licenses and Subscriptions*

3.  All agreements with TallyWorks*

4.  All agreements with TallyExpress*

5.  All agreements with Trade-Tec*

6.  The following software licenses*:

    (a) Legna log and lumber software – Tract and log management and sales, and lumber inventory management and sales.

    (b) Microsoft 365 – Email, email archiving, and office software.

    (c) Trend Micro with Vision One – Software based security and analysis.

    (d) Aptean – Accounting.

    (e) Ascend TMS – Shipping planning and management.


\* All assignments of software licenses and agreements will be partial to convey only rights related to the Business. All software licenses and agreements listed above are subject to Purchaser's further diligence and will be included and considered as Assigned Contracts solely to the extent the Purchaser elects to assume such software licenses and agreement in writing prior to the Closing. This Schedule 1.01(a) shall be updated prior to Closing in  accordance with the foregoing.

CORE/3528339.0005/190929139.1

**Schedule 2.02(d)**
**Acquired Assets – Motor Vehicles and Loaders**

1. <u>Schedule 2.02(e)</u> of these Schedules are hereby incorporated herein by reference.

3

**Schedule 2.02(e)**
**Acquired Assets – Fixed Assets**

**Riverton, WV - Mill #1**

| Asset ID | Acquisition Date | Description | Serial Number | Model Number |
|---|---|---|---|---|
| *Assets to convey with a book value greater than $10,000* | | | | |
| 001812 | 10/28/2013 | Cleerman Model 42 Linear Carriage | | Model 42 |
| 002657 | 10/31/2018 | 72" High Strain Extended Column Bandmill | | |
| 002560 | 11/30/2016 | Electrical Upgrade | | |
| 002543 | 6/14/2016 | Volvo L90H Wheel Loader | VCE0L09HA0S623644 | L90H |
| 001578 | 3/22/2011 | Komatsu Loader | A35097 | 2WP12A |
| 001935 | 11/11/2014 | Cleerman 150 Hydrostatic Carriage Drive | | 150 |
| 001863 | 8/12/2014 | Komatsu Knuckleboom | A86004 | PC200LL |
| 002588 | 4/1/2017 | Office Building Mill #1 | | |
| 002717 | 4/30/2021 | Precision Chipper 66" | | |
| 002750 | 10/20/2021 | Quincy Air Compressor 150HP | 8158128879 | Quincy 150HP |
| 002795 | 9/20/2022 | Air Dryer | 2334191E | HB-800 |
| 000053 | 8/15/1993 | 10 X 48 Top Arbor Gang | | |
| 000050 | 9/15/1987 | Sawmill Improvements | | |
| 002701 | 11/30/2020 | Chip Screen 8x8 | | PCS-88 |
| 001823 | 12/20/2013 | Vibrating Conveyor | 20647 - 51 | N/A |
| 000028 | 8/15/1993 | Arbor Gang Bldg | | |
| 002838 | 10/31/2023 | Well Drilling and well house | | |
| 001813 | 10/28/2013 | Cleerman Model 42 Bar Turner | | Model 42 |
| 000034 | 11/15/1998 | Sawmill Improvements | | |
| 002551 | 7/31/2016 | Rebuilt Bark Grinder | 2981 | ER42PM-HZF |
| 000115 | 10/15/1992 | Mill Addition | | |
| 002617 | 9/30/2017 | Vibrating Conveyor | AWP17-801-1 | |
| 000030 | 3/1/1994 | Trimmer Bldg. | | |
| 002636 | 1/30/2018 | Sawmill adjoining land | | |
| 000058 | 3/1/1994 | Trimmer | | |
| 002770 | 2/1/2022 | Tie stacker | | |
| 001852 | 7/29/2014 | Armstrong Automatic Band Saw Leveler - Used | | |
| 000114 | 7/15/1990 | Office Building | | |
| 002700 | 9/21/2020 | 2020 Ram 1500 | 3C6JB7AT1LG236644 | 1500 Class |

Item 002700 the 2020 Ram 1500 VIN 3C6JB7AT1LG236644 is not included as an item being transferred.

This item is included as an item being transferred:

| 1-228 | Taylor | 2014 | Forklift | TXB300I | SFK39223 |
|---|---|---|---|---|---|

4

**Riverton, WV - Mill #1**

| Asset ID | Acquisition Date | Description | Serial Number | Model Number |
|---|---|---|---|---|
| | | **Assets to convey, assuming they have not been replaced or disposed of with a book value of less than $10,000** | | |
| 002550 | 7/31/2016 | Storm Water Drain | | |
| 001934 | 11/24/2014 | Robotec Grapple | 109204-1-1 | 5052-RT502 |
| 000029 | 10/15/1993 | Lunchroom & Storage | | |
| 001706 | 2/23/2012 | Sorting Grapple | 6622501 | SG40 |
| 000026 | 7/1/1973 | Saw Mill & Capital Improvements | | |
| 000031 | 7/1/1995 | Sawmill Improvements | | |
| 000033 | 10/15/1997 | Sawmill Improvements | | |
| 001007 | 8/2/2005 | Chip Auger System | | |
| 001535 | 3/25/2009 | 2007 Cat 216B Skid Steer Loader | CAT0216BHRLL07701 | 216B |
| 000054 | 9/21/1993 | Top Face Grinder | | |
| 000055 | 9/21/1993 | Side Grinder | | |
| 000025 | 11/7/2000 | Paving | | |
| 001817 | 11/30/2013 | Starter Headsaw 200 HP | RX2E200480112KP | RX2E |
| 002716 | 3/23/2021 | Magnetic Separator for Conveyor | | G2 |
| 002552 | 7/31/2016 | Electric Motor for Montgomer Bark Grinder | 10302.01 | TEFC 445 Frame |
| 001529 | 11/10/2008 | Tie removal System | | |
| 001005 | 12/6/2006 | New Shaker | | |
| 001178 | 6/19/2006 | Gangsaw | | |
| 001443 | 5/18/2007 | Sawdust Incline Auger Carbon Steel Liner 1/4" X 10' | | |
| 002728 | 8/17/2021 | Network & phone upgrade - New Era Technology | | |
| 002740 | 8/11/2021 | Handhelds & software - Landmark Sales | | |
| 001444 | 7/9/2007 | Gearbox for Gangsaw | | |
| 002620 | 9/25/2017 | Walkon Trailer | 5NHUFA215G1057470 | Walkon 12' |
| 001329 | 7/5/2006 | Auger System Parts | | |
| 001330 | 10/16/2006 | Log Deck | | |
| 000021 | 6/30/1973 | Parking Lot | | |
| 000027 | 7/1/1973 | Office & Capital Improvements | | |
| 000036 | 7/20/1973 | Live Log Deck - Reckart | | |
| 000037 | 8/9/1973 | Live Log Deck - Reckart #2 | | |
| 000038 | 8/14/1973 | Bark Conveyor | | |
| 000043 | 9/10/1973 | Lumber Rolls | | |
| 000044 | 10/12/1973 | Roof Top Chain Conveyor | | |
| 000045 | 12/1/1973 | Knife Grinder | | |
| 000046 | 3/4/1974 | Saw Grinder | | |
| 000113 | 4/17/1977 | Shed & Sheeting | | |
| 000123 | 12/1/1980 | Septic System | | |
| 000138 | 2/7/1989 | Tramsformer | | |
| 000056 | 9/21/1993 | Grinder Equipment | | |
| 000057 | 11/2/1993 | Indexing Chains | | |
| 000147 | 12/16/1993 | Debarker | | |
| 000061 | 11/15/1994 | Power Unit | | |
| 000062 | 11/15/1994 | Chipper Motor | | |
| 000065 | 9/19/1995 | Conveyor | | |
| 000032 | 5/1/1997 | Sawmill Improvements | | |
| 000022 | 11/3/1998 | Paving | | |
| 000074 | 12/29/1998 | Conveyor | | |
| 000023 | 2/17/1999 | Septic System | | |
| 000024 | 12/13/1999 | Road Paving | | |
| 000079 | 6/13/2000 | Vibrating Table | | |
| 000081 | 9/13/2000 | Vib Table | | |
| 000035 | 10/16/2001 | Sound Curtains | | |
| 000119 | 9/25/2002 | Paving | | |
| 000084 | 4/1/2003 | Acoustical Curtains | | |
| 000162 | 4/1/2003 | Acoustical Curtains | | |
| 000823 | 9/3/2004 | Prentice 410 C (Mounted on asset # 1490 Pierce Crawler) | 25708 | 410C |
| 000837 | 9/3/2004 | Maintenance Equipment (welders) | | |
| 001318 | 8/29/2006 | Typewriter | | |
| 001490 | 10/30/2007 | Pierce Crawler (Asset # 823 Pentice 410C Loader is mounted on the crawler) | Prentice 410C Mounted #000823 | Crawler |
| 002528 | 12/28/2015 | Allegro 2 with Bluetooth | | |

5

## Schedule 2.02(g)
## Owned Real Property

### Riverton Legal Description (from title):

**Parcel 1:**

A certain tract or parcel of land located about 1 mile West of Riverton and situate North of U.S. Route 33 and WV Route 28, in Union District, Pendleton County, West Virginia, and more particularly described by metes and bounds as follows:

(All bearings refer to WV State Plane, North Zone, NAD 1983 and distances are horizontal)
Beginning at a 3/4 inch Steel Rebar (set), a common corner with Shirley & Steve Lambert (TM 67/PR 4.4) and Allegheny Wood Products, Inc. (TM 67/PR 6), referenced by a 5/8 inch Steel Rebar (found) in a fence line, bearing South 73 degrees 33 minutes 59 minutes East, 262.99 feet; thence with Allegheny Wood Products, North 56 degrees 02 minutes 39 seconds West, 169.36 feet to an Old 8 inch Locust Post (found); thence continuing with Allegheny Wood Products, North 86 degrees 56 minutes 40 seconds West, 113.49 feet to a 3/4 inch Steel Rebar (set), a common corner with Shirley & Steve Lambert (TM 67/PRs 4.4 & 4.6); thence leaving Allegheny Wood Products and with both Lambert tracts,
North 15 degrees 15 minutes 34 seconds West, 5.44 feet to a Point in the centerline of Blizzard Run, referenced by a Dead Hemlock Snag and a Fence Corner, bearing North 13 degrees 27 minutes 57 seconds West, 78.44 feet, a common corner with Shirley & Steve Lambert (TM 67/PR 4.6) and Shirley & Steve Lambert (TM 67/PR 4.4); thence leaving Shirley & Steve Lambert (TM 67/PR 4.6) and with Shirley & Steve Lambert (TM 67/PR 4.4), and nine new lines of division following the meanders of Blizzard Run downstream,
North 88 degrees 35 minutes 13 seconds East, 19.44 feet to a Point in Blizzard Run; thence,
North 79 degrees 26 minutes 25 seconds East, 29.81 feet to a Point in Blizzard Run; thence,
South 81 degrees 36 minutes 18 seconds East, 60.01 feet to a Point in Blizzard Run; thence,
South 89 degrees 59 minutes 13 seconds East, 29.96 feet to a Point in Blizzard Run; thence,
South 86 degrees 41 minutes 40 seconds East, 30.76 feet to a Point in Blizzard Run; thence,
South 57 degrees 11 minutes 27 seconds East, 21.00 feet to a Point in Blizzard Run; thence,
South 39 degrees 22 minutes 24 seconds East, 59.13 feet to a Point in Blizzard Run; thence
South 51 degrees 21 minutes 22 seconds East, 40.09 feet to a Point in Blizzard Run; thence leaving Blizzard Run, South 00 degrees 01 minutes 42 seconds West, 19.17 to the point of beginning, containing 0.120 Acres, more or less, as surveyed by Geary Associates, PLLC, Mark C. Geary, WV PS No 1523, of Petersburg, West Virginia, in June 2017, as shown on the Plat attached hereto and made part of this description.

BEING a portion of the same property conveyed to Allegheny Wood Products Inc., a West Virginia Corporation by Deed from Shirley Lambert and Steve Lambert dated January 30, 2018, recorded in the Clerk's Office of the County Commission of Pendleton County, West Virginia in/as Book 205, Page 525

**Parcel 2:**

Situate approximately One mile South of Riverton and on the West side of and adjacent to US Route 33, Union District, Pendleton County, West Virginia, and being more particularly described by its metes and bounds as follows:

Beginning at an iron stake set in concrete on the West side of US 33, thence running with edge of road North 55 East 125 feet to another iron stake set in concrete; thence leaving the road North 42 West 125 feet to another iron stake set in concrete; thence South 55 West 125 feet to another iron stake set in concrete; thence South 42 East 125 feet to the point of beginning, containing .35 acres, more or less.
BEING a portion of the same property conveyed to Allegheny Wood Products Inc., a West Virginia Corporation by Deed from Pill & Pill, PLLC dated February 12, 2020, recorded in the Clerk's Office of the County Commission of Pendleton County, West Virginia in/as Book 211, Page 526 .

6

**Parcel 3:**

A certain tract or parcel of land located about 1 mile West of Riverton and situate North of U.S. Route 33 and WV Route 28, in Union District, Pendleton County, West Virginia, and more particularly described by metes and bounds as follows:

(All bearings refer to WV State Plane, North Zone, NAD 1983 and distances are horizontal)
Beginning at a 16 inch White Oak, found with 6 hack marks, referenced by a 5/8 inch Steel Rebar (found), bearing North 42 degrees 03 minutes 04 seconds West, 328.78 feet, a common corner with Allegheny Wood Products Inc. (TM 67/PR 6), United States of America U.S.F.S (TM 1/PR 8.1) and Shirley & Steve Lambert (TM 67/PR 4.6); thence with Shirley & Steve Lambert and five new lines of division,
North 47 degrees 30 minutes 15 seconds East, passing a 3/4 seconds Steel Rebar (set) on the bank of the run at 32.43 feet, continuing the same course 46.82 feet in all, to a point in the centerline of Blizzard Run; thence with four calls following the meanders of Blizzard Run downstream,
South 41 degrees 55 minutes 38 seconds East, 54.29 feet to a Point in Blizzard Run; thence,
South 60 degrees 59 minutes 55 seconds East, 76.71 feet to a Point in Blizzard Run; thence,
South 54 degrees 33 minutes 55 seconds East, 48.60 feet to a Point in Blizzard Run; thence,
South 41 degrees 56 minutes 39 seconds East, 23.36 feet to a Point in Blizzard Run, referenced by a 1/2 inch Pinched Pipe, bearing South 64 degrees 38 minutes 38 seconds East, 123.74 feet; thence leaving Blizzard Run and with Allegheny Wood Products, North 64 degrees 38 minutes 38 seconds West, passing a 3/4 inch Steel Rebar (set) at 33.20 feet, continuing the same course 213.69 feet in all to the point of beginning, containing 0.098 Acres, more or less, as surveyed by Geary Associates, PLLC, Mark C. Geary, WV PS No 1523, of Petersburg, West Virginia, in June 2017, as shown on the Plat attached hereto and made part of this description.

BEING a portion of the same property conveyed to Allegheny Wood Products Inc., a West Virginia Corporation by Deed from Shirley Lambert and Steve Lambert dated January 30, 2018, recorded in the Clerk's Office of the County Commission of Pendleton County, West Virginia in/as Book 205, Page 525

**Parcel 4:**

Tract No. 1: Beginning at a double walnut East of the Mill pond; thence North 78 degrees 25 minutes West 24 rods to a stake; thence North 12 East 10 rods to a stone pile near a path on a property between the property herein conveyed and the property of Glenn Ruddle: thence leaving his line North 70 West 20.5 rods to a white oak; thence South 63 degrees 75 minutes West 30 rods to a hickory against a hill-side; thence South 57 degrees 25 minutes East 50.25 rods to a cherry tree at Ray Warner on a knoll; thence along said Warner property South 88 East 26.52 rods to a locust near Ray Warner's house; thence with the same South 39 East 7.96 rods to a stake on U. S. Route 33 and with the same North 53_19.16 rods to a stake on same road; thence with the same North 61 degrees East 20 rods to a point in Glenn Ruddle's line; thence North 63 degrees 25 minutes West 14.44 rods to a walnut stump, another of Glenn Ruddle's corners; thence with his line South 86 West 26 rods to the place of beginning, containing 13.65 acres, more or less.

Tract No. 2: Beginning at an iron stake, a point in line of Mabel Ruddle and Henry Regnery and leaving same; thence North 59 West 3-4/5 poles to a locust post; thence North 89 West 6.65. poles to a locust post; thence South 21 West 1.36 poles to a point in former line; thence with same South 73-1/2 East 5-3/5 poles to a walnut, a former corner; thence North 81 East 5 poles to the beginning, Containing 1/8 acre, more or less.

Both of the aforesaid tracts of real estate were conveyed to A. J. Rost by deed bearing date on the 4th day of June, 1966, from Selmet Properties, Inc., which deed is of record in the Clerk's Office of Pendleton County, West Virginia, in Deed Book No. 85, Page 223, to which deed reference is herewith made for all pertinent purposes.

There is excepted and reserved from the tract of 13.65 acres, the following off conveyances:
A tract of 1.3 acres conveyed by Henry Regnery and wife to Mabel Ruddle on the 12th day of April, 1965, which deed is of record in the aforesaid Clerk's Office in Deed Book No. 84, Page 229, and is bounded as follows:
Beginning at an iron stake, a point in line of Mabel Ruddle and Henry Regnery, thence with same North 81 East 21 poles to a walnut stump, a former corner between same; thence South 69 East 13-2/5 poles to a point on West side of U. S. 33; thence leaving said line South 60 West 6-4/5 poles running with edge of road to a locust post; thence North

66 West 5-3/5 poles to a locust post; thence North 77 West 15-3/5 poles to a locust post; thence North 59 West 6-3/5 poles to the beginning.

A tract of .35 acre, more or less, conveyed by Selmet Properties, Inc., by deed dated June 7, 1966, to Ray Russell Day, et al., which off conveyance is described as follows: Beginning at an iron stake set in concrete on the West edge of U. S. Route 33, thence running with edge of road North 5 East 125 feet to another iron stake set in concrete; thence leaving the road North 42 West 125 feet to another iron stake set in concrete; thence South 55 West 125 feet to another iron stake set in concrete; thence South 42 East 125 feet to the point of beginning, which off-conveyance is of record in the Clerk's Office of Pendleton County, West Virginia, in deed book no. 85, page _ to which deed reference is herewith made for all pertinent purpose.

BEING a portion of the same property conveyed to Allegheny Wood Products Inc., a West Virginia Corporation by Deed from John W. Crites and Patricia Ann Crites his wife, Elbert Lee Cole and Janice Erle Cole, his wife dated August 15, 1973, recorded in the Clerk's Office of the County Commission of Pendleton County, West Virginia in/as Book 93, Page 255.

**Parcel 5:**

A certain tract or parcel of land located about 1 mile West of Riverton and situate North of U.S. Route 33 and WV Route 28, in Union District, Pendleton County, West Virginia, and more particularly described by metes and bounds as follows:

(All bearings refer to WV State Plane, North Zone, NAD 1983 and distances are horizontal)
Beginning at a 3/4 inch Steel Rebar (set), a common corner with Shirley & Steve Lambert (TM 67/PR 4.4 and 4.6) and Allegheny Wood Products Inc. (TM 67/PR 6); thence with Allegheny Wood Products, South 23 degrees 30 minutes 38 seconds West, 22.49 feet to a Point; thence continuing with Allegheny Wood Products Inc., North 80 degrees 08 minutes 41 seconds West, crossing Blizzard Run, 308.53 feet to a Point; thence continuing with Allegheny Wood Products, North 16 degrees 56 minutes 19 seconds East, 143.34 feet to a Point in the centerline of Blizzard Run, referenced by a 1/2 inch Pinched Pipe, bearing North 16 degrees 56 minutes 19 seconds West, 21.66 feet, a common corner with Shirley & Steve Lambert (TM 67/PR 4.6); thence leaving Allegheny Wood Products and with Shirley & Steve
Lambert and nine new lines of division following the meanders of Blizzard Run downstream,
South 61 degrees 48 minutes 41 seconds East, 26.32 feet to a Point in Blizzard Run; thence,
South 65 degrees 23 minutes 17 seconds East, 40.90 feet to a Point in Blizzard Run; thence,
South 49 degrees 19 minutes 24 seconds East, 38.77 feet to a Point in Blizzard Run; thence,
South 21 degrees 32 minutes 10 seconds East, 34.76 feet to a Point in Blizzard Run; thence,
South 25 degrees 26 minutes 38 seconds East, 59.14 feet to a Point in Blizzard Run; thence,
South 51 degrees 42 minutes 24 seconds East, 32.83 feet to a Point in Blizzard Run; thence,
South 77 degrees 18 minutes 21 seconds East, 56.20 feet to a Point in Blizzard Run; thence,
South 76 degrees 11 minutes 40 seconds East, 34.80 feet to a Point in Blizzard Run; thence,
South 88 degrees 18 minutes 40 seconds East, 27.42 feet to a Point in Blizzard Run, referenced by a Dead 13 inch Hemlock Snag and a Fence Corner, bearing North 13 degrees 27 minutes 57 seconds West, 78.44 feet, a common corner with Shirley & Steve Lambert (TM 67/PR 4.4); thence continuing with Shirley & Steve Lambert, South 15 degrees 15 minutes 34 seconds East, 5.44 feet to the point of beginning, containing 0.436 Acres, more or less, as surveyed by Geary Associates, PLLC, Mark C. Geary, WV PS No 1523, of Petersburg, West Virginia, in June 2017, as shown on the Plat attached hereto and made part of this description.

BEING a portion of the same property conveyed to Allegheny Wood Products Inc., a West Virginia Corporation by Deed from Shirley Lambert and Steve Lambert dated January 30, 2018, recorded in the Clerk's Office of the County Commission of Pendleton County, West Virginia in/as Book 205, Page 525

CORE/3528339.0005/190929139.1

**Schedule 2.02(h)**
**Leased Real Property**

1.      None.

**Schedule 2.02(i)**
**Information, files and records as Acquired Assets**

1.  All historical data and information stored in each of (1) TalleyExpress, (2) Tally Works and (3) Traverse with respect to the Business.

CORE/3528339.0005/190929139.1

**Schedule 2.02(o)**
**Other Acquired Assets**

1.      None.

**Schedule 2.03(g)**
**Excluded Assets**

1.    <u>Schedule 4.13(a)</u> of these Schedules are hereby incorporated herein by reference.

CORE/3528339.0005/190929139.1

**Schedule 2.05**
**Excluded Liabilities**

1. Any material liability or obligation (a) relating to any liability or obligation (including accounts payable) owed to any Seller's equityholders or any Seller's Affiliates; (b) for Taxes; (c) for any Indebtedness; (d) relating to, resulting from or arising out of (i) any claims made in any pending or future suit, litigation, action, claim, arbitration, proceeding or investigation by or before any Governmental Entity or arbitrator, (ii) claims based on violations of Law, breach of Contract, product liability, warranty, employment practices, or environmental, health and safety matters or any other actual, potential or alleged failure of any Seller to perform any obligation, in each case, arising out of, resulting from or relating to, (A) events that shall have occurred or that failed to occur, (B) services performed or required to be performed, (C) products offered or delivered to customers or (D) the operation of the Business or the ownership or use of any of the Acquired Assets, in each case, prior to the Closing, or (iii) any violation of Law by, or in connection with the operation of, the Business or the ownership or use of the Acquired Assets after the Closing that was first caused, first arising, first occurring or first existing as of or prior to the Closing; (e) any claims by any creditor or any direct or indirect holder (or purported holder) of any Equity Interests of any Seller that (A) such Person is entitled to consideration as a result of the consummation of the transactions contemplated by this Agreement or (B) that the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby were not duly and validly approved or consummated in accordance with the organizational documents of any of the Sellers or applicable Law; (f) pertaining to any Excluded Asset; (g) relating to, resulting from or arising out of (i) the employment (or application for or termination of employment) or engagement (or application for or termination of engagement) by any Seller of (any employee or independent contractor or other service provider of any Seller arising at any time or (ii) any claim or litigation between any Seller or any of its Affiliates, on the one hand, and any current or former employee or individual service provider of any Seller or any of its Affiliates, on the other hand, to the extent that such dispute or litigation relates to actions, inactions or other circumstances that occurred on or prior to or following the Closing Date; (h) relating to, resulting from or arising out of any Seller Benefit Plan (including all bonuses payable to current or former employees thereunder); (i) relating to any non-compliance by any Seller with any applicable bulk sales Law; (j) relating to any obligation to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of any Seller (including with respect to any breach of fiduciary obligations by same); (k) for any Transaction Expenses; (l) relating to or arising out of the ownership or use of the Acquired Assets or the operation of the Business, in each case, prior to the Closing or any Legal Proceeding relating to or otherwise in respect thereof; (m) for any intercompany accounts payable among the Sellers and their respective Affiliates; or (n) for any other liabilities or obligations described in the Purchase Agreement.

CORE/3528339.0005/190929139.1

**Schedule 4.03**
**Absence of Restrictions and Conflicts**

1.      None.

14

**Schedule 4.04**
**Real Property**

(a)

1. Liens for real estate taxes that are not yet due and payable.
2. Deeds of Trust, Mortgages and Fixture Filings in favor of United Bank and Summit Community Bank.
3. All of those items disclosed by title insurance commitments obtained by the Purchaser with respect to the Owned Real Property.

(b)

1. None.

(c)

1. None.

(d)

1. None.

15

**Schedule 4.05**
**Title to Acquired Assets**

1. Schedule 4.04(a) of these Schedules is hereby incorporated herein by reference.
2. The following UCC filings, all of which will be released at Closing pursuant to the Receivership Order:

**Allegheny Wood Products, Inc./Allegheny Wood Products International, Inc.**

1.

| | *UCC No.* | *Date* | *Secured Party* | *Brief Description of Collateral* | *Notes/Other filings* |
|---|---|---|---|---|---|
| 2 | 2023E062900042 *Debtor is AWP, Inc. AND Allegheny Wood Products International, Inc. | 06/29/2023 | United Bank | Impacts sawmill facilities in Greenbrier, Mercer, Raleigh, Preston, and Webster Counties, West Virginia. All property described on Exhibit A, all right/title/interest to all estates, easements. . . , all right to and in any standing timber on property, all rent, income, other proceeds, all right title and interest to all buildings | |
| 3 | 2023E062800024 *Debtor is Debtor is AWP, Inc. AND Allegheny Wood Products International, Inc. | 06/28/2023 | United Bank | All assets except that "Equipment" and "Fixtures" are limited to those located in Webster, Raleigh, Mercer, Greenbrier, and Preston Counties in West Virginia and in Clarion County, PA. | |
| 4 | 2023E053100074 *Debtor is Allegheny Wood Products International, Inc. | 05/31/2023 | United Bank | All equipment/fixtures at sawmill facilities in Kingwood, Cowen, Princeton, Beckley, and Smoot WV | |

CORE/3528339.0005/190929139.1

| | *UCC No.* | *Date* | *Secured Party* | *Brief Description of Collateral* | *Notes/Other filings* |
|---|---|---|---|---|---|
| 5 | 2023E053100071 | 05/31/2023 | United Bank | All equipment/fixtures at sawmill facilities in Kingwood, Cowen, Princeton, Beckley, and Smoot WV | |
| 7 | 2023E041400059 *Debtor is AWP, Inc. AND Allegheny Wood Products International, Inc. | 04/14/2023 | United Bank | All assets – impacts property of Debtor that is located on, useful in the operation of, or otherwise related to Debtor's sawmill complex in Clarion County, PA. | |
| 8 | 2023E020200027 | 02/02/2023 | Speyside Bourbon Stave Mill, Inc. | 500,000 board feet of white oak logs, wherever located, cut or uncut | |
| 22 | 2020E061600064 | 06/16/2020 | United Bank | All assets (Kingwood) | 04/22/2022 – Removed Wastewood chipper, 2022 Peterbuilt Truck, 2 Band Mills 12/31/2021 – Removed 2 Komatsu Wheel Loaders and 1 Knife Grinder 01/14/2022 – removed 2 Komatsu wheel loaders |
| 24 | 2020E010200003 | 01/02/2020 | United Bank | All right/title/interest in Allegheny Wood Timber Products Inc. in and to membership interest held by debtor in Allegheny | |

CORE/3528339.0005/190929139.1

|    | *UCC No.* | *Date* | *Secured Party* | *Brief Description of Collateral* | *Notes/Other filings* |
|----|-----------|--------|-----------------|----------------------------------|------------------------|
|    |           |        |                 | Wood Timber Products, LLC |  |
| 28 | 2019E061000037 *Debtor is Allegheny Wood Products International, Inc. | 06/10/2019 | Summit Community Bank | First priority security interest in all equipment, fixtures, and rolling stock owned/acquired at Petersburg, Riverton, Hazelton Dry Kiln Facility in Bruceton Mills, Norton in Coalton, WV and owned by Allegheny Wood Products International, Inc. | Financing statement is a fixture filing |
| 29 | 2019E061000035 | 06/10/2019 | Summit Community Bank | First priority security interest in all equipment, fixtures, and rolling stock owned/acquired at Petersburg, Riverton, Hazelton Dry Kiln Facility in Bruceton Mills, Norton Coalton, WV and owned by Allegheny Wood Products, Inc | 04/22/2022 – Removed 1 wastewood chipper, one 2022 Peterbuilt Truck, one band mill, two 2021 dodge ram trucks, one 2022 dodge ram truck, one 2021 ford F150 truck (addendum filed as fixture filing and references Petersburg location) |
| 36 | 2018E071600060 | 07/16/2018 | United Bank | All Assets (covers timber to be cut and impacts property of Debtor that is located on, used or useful in the operation of or otherwise related to | Collateral Change 1/14/2022 – removed 2 wheel loaders Collateral Change 12/29/2021 – |

18

| | UCC No. | Date | Secured Party | Brief Description of Collateral | Notes/Other filings |
|---|---|---|---|---|---|
| | | | | or pertient to all the timber growing, lying or standing, existing now or in the future on tracts of land in Warren and Venago Counties, PA) related to PA Timber project | removed 2 wheel loaders and one rotary knife grinder 04/22/2022 Removed one wastewood chipper and one 2022 Petebuilt Truck **Continuation filed 04/03/2023** |
| 38 | 2018E050200075 *Debtor is Allegheny Wood Products International, Inc. | 05/02/2018 | United Bank | All assets (no exclusions for Summit Dry Kilns) | **Continuation filed 04/03/2023** |
| 39 | 2018E050200072 AWP is Debtor | 05/02/2018 | United Bank | All assets | 12/29/2021 delete two Komatsu Wheel Loaders and One Newman G-280 Rotary Knife Grinder 01/14/2022 – deleted two Komatsu wheel loaders 02/08/2021 – deleted collateral located at facility in Clarion County, Pennsylvania 04/22/2022 deleted one wastewood chipper, one Peterbilt 337 truck and 2 band mills(?) |

| | UCC No. | Date | Secured Party | Brief Description of Collateral | Notes/Other filings |
|---|---|---|---|---|---|
| | | | | | Continuation filed 04/03/2023 |
| 40 | 2018E050200062 AWP is Debtor | 05/02/2018 | United Bank | All assets filing but also appears to Covers timber in Pocohontas county) Does not contain "Good" definition which appear in more recent filings<br><br>(Would appear to create issue for Summit as this equipment definition contains no carve outs)<br><br>Some collateral is removed over time—some of this might become collateral for Summit if located at one of its 4 sites. | 04/22/2022 removed Wastewood Chipper, 2022 Peterbuilt Truck 01/14/2022 removed 2 komatsu model wheel loaders 04/22/2022 removed one wastewood chipper, one peterbuilt truck, 2 band mills 12/29/2021 – removed 2 Komatsu wheel loaders, one knife grinder **Continued 04/03/2023** |
| 52 | 201438816029 AWPI is only debtor | 09/30/2014 | United Bank | All assets but not any equipment at Debtor's facilities OTHER THAN facilities in Mercer and Webster Counties, WV, Clarion County, PA, newly acquired Greenbrier and Raleigh Counties, WV, and Washington County, OH. | Continued 08/19/2019<br><br>02/08/2021 – removed collateral equipment located in Clarion County, PA |
| | 2022E060600017 AWP is Debtor | 06/06/2022 | Liugong Finance | All rights to and interest in the Equipment, together with all | |

| UCC No. | Date | Secured Party | Brief Description of Collateral | Notes/Other filings |
|---|---|---|---|---|
| | | | proceeds, attachments, accessories, parts, additions and any substitutions thereto, under Installment Payment Agreement No. 4261300-002 | |
| 2019E5010074 AWPI is only debtor | 05/01/2019 | Wells Fargo Bank, N.A. | The equipment described below and all equipment parts, accessories, substitutions, additions, accessions, and replacements thereto and thereof, now or hereafter installed in, affixed to, or used in conjunction therewith and the proceeds thereof, together with all installment payments, insurance proceeds, other proceeds and payments due and to become due arising from or related to said equipment. ONE (1) TAYLOR FORKLIFT, MODEL# X-360M S/N: 43049 | Continued 03/27/2024 The equipment in the collateral should be Taylor Forklift X-300S, Serial # 43050. Wells Fargo has initiated a UCC amendment to correct the serial number. |

**Allegheny Wood Products, Inc. re Allegheny Wood Timber Products, LLC:**

| 24 | 2020E010200003 | 01/02/2020 | United Bank | All right/title/interest in Allegheny Wood Timber Products | |
|---|---|---|---|---|---|

21

|  |  |  |  | Inc. in and to membership interest held by debtor in Allegheny Wood Timber Products, LLC |  |
|---|---|---|---|---|---|

**Allegheny Wood Timber Products, LLC:**

|  | *UCC No.* | *Date* | *Secured Party* | *Brief Description of Collateral* | *Notes/Other filings* |
|---|---|---|---|---|---|
| 6 | **2023E041400066** | **04/14/2023** | **United Bank** | **All assets with specific references to standing timber, standing timber which is to be cut and removed under a conveyance or contracts of sale, and cut timber.** |  |

Chrysler Capital Lease on titled vehicles. Additional details to be provided by Seller on or before July 15, 2024.

**Condition of Acquired Assets**:

1.  None.

**Constitute All Material Assets**:

None.

CORE/3528339.0005/190929139.1

23

**Schedule 4.06**
**Legal Proceedings**

1. *Deanna Wolford v. Allegheny Wood Products, Inc., et al.*
   Circuit Court of Grant County, West Virginia; Civil Action No.:  23-C-23

   a) <u>Insurance</u>:  Yes – Chubb – EPLI ($100,000 deductible).

   b) <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC.

   c) <u>Brief Factual Description</u>:  Suit claiming employment discrimination, harassment, and constructive discharge. A former janitorial employee alleges she was forced to quit because of discrimination and harassment.

   d) <u>Notes</u>: Claim value is minimal.  Deductible is not close to being met. **An Order for Stay of the proceedings was entered on March 21, 2024.**

2. *Lawrence Kessel and LRBA, LLC v. Allegheny Wood Products, Inc. et al.*
   Circuit Court of Grant County, West Virginia; Civil Action No.:  CC-12-2023-C-30

   a) <u>Insurance</u>:  No

   b) <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC

   c) <u>Brief Factual Description</u>:  Suit claiming breach of contract of timber sale agreement. Affirmative defenses are being asserted.

   d) <u>Notes</u>: **An Order for Stay of the proceedings was entered on March 21, 2024.**

3. *Robert & Mona Mills v. K & S Logging, LLC Kenneth, Sandra Varner & Allegheny Wood Products, Inc.*
   Circuit Court of Pocahontas County, West Virginia; Civil Action No.:  19-C-41

   a) <u>Insurance</u>:  Yes – Wesco – General Liability (no deductible)

   b) <u>Counsel of Record</u>:  Jason L. Holliday, Dinsmore and Shohl, LLC

   c) <u>Brief Factual Description</u>:  Claim of Negligence: AWP engaged independent contractor (K & S Logging, LLC.) to log a tract of timber in Pocahontas County, West Virginia during which a contractors' employee was injured.

   d) <u>Notes</u>: **<u>Order for Stay of the proceedings was entered on March 21, 2024</u>.**

24

4. *Emily Stickland V. Quality Woods, Inc. et. al.,*
   Circuit Court of Putnam County, West Virginia

   a) <u>Insurance</u>:  Yes – Pennsylvania Lumberman Manufacturers (PLM) - General Liability

   b) <u>Counsel of Record</u>:  Colton Parsons and Michael Mullins, Steptoe and Johnson, PLLC

   c) <u>Brief Factual Description</u>: Motor vehicle accident resulting in the death of 14-year-old minor, Leah Strickland. Leah was riding as a passenger in an SUV owned and operated by her father, Michael Strickland when Michael Strickland collided with a flatbed truck, operated by Co-Defendant Quality Woods, Inc. Police reports surmise that Michael Strickland was "reckless" for "Inattentive, careless and improper driving" and committed "negligent homicide." Six bundles of Red Oak Lumber were loaded "at AWP's Hazelton facility onto the aforementioned flatbed truck owned and operated by Co-Defendant Quality Woods, Inc. as a "customer pick-up". Plaintiff alleges truck was overloaded.

   d) <u>Notes</u>: **A Motion for Stay was filed with the court on March 21, 2024**.

5. *James Beane, et al. v. Allegheny Wood Product (sic)*
   Federal District Court for the Southern District of West Virginia, Civil Action No.: 5:24-cv-102

   a) Insurance: None

   b) Counsel of Record:  Jason Bowles at Jenkins Fenstermaker, PLLC

   c) <u>Brief Factual Description</u>:  Class action suit for alleged violation of the WARN Act, 20 U.S. C. Section 2101-2109, for failure to give a 60- day notice as required under the statute in certain circumstances; and, the West Virginia Wage Payment and Collection Act, W. Va. Code Section 21-5-1, et seq., for failure to make payment of wages on the next regular payday.

   d) Notes:  **A Joint Motion for Stay was filed with the court on March 21, 2024**

6. <u>*Allegheny Wood Products, Inc. v. The Town of Moorefield*</u>-
   Circuit Court of Hardy County, West Virginia, Civil Action No.: *CC-16-2023-C-16*

   a) Insurance:  No

   b) Counsel of Record:  Colton Parsons, Steptoe and Johnson, PLLC

CORE/3528339.0005/190929139.1

c) Allegheny Wood Products, Inc. filed action seeking declaratory judgement and injunctive relief. The Town of Moorefield filed a counterclaim of declaratory judgement regarding AWP's Log yard in Moorefield, WV.  Hearing was held wherein the Town of Moorefield's counterclaim for injunctive relief was denied. **The parties reached a settlement and final order was entered on February 14, 2024.**

7. *State of West Virginia v. Allegheny Wood Products, Inc.*
   Magistrate Court of Tucker County, West Virginia, Case No.: 24-M47W-0001

   a) Insurance – Doubtful

   b) Counsel of Record – None yet.

   c) Worthless check compliant.  A check in the amount of $4,246.61, paid to the order of Ace Aggregates, LLC was returned.  Complainant, states that bank produced a statement that the account for which the check was written was "frozen and blocked."

   d) Notes: Magistrate court was contacted, and the matter has been stayed.  The complainant was sent a copy of the Order of Stay and a claim form.

8. *Forestry Associates, Inc. v.  Allegheny Wood Products*
   Magistrate Court of Nicholas County, West Virginia, Case No.:  24-M34C-00081

   a)     Insurance – Doubtful

   b)     Counsel of Record – None known.

   c)     Complaint states that Allegheny Wood Products, Inc. owes Forestry Associates, Inc. $4,635.87 for logs delivered to its Cowen, WV facility on February 21, 2024.

   d)     Notes:  On April 8, 2024, the Nicholas County Magistrate Court was notified, and the matter has been stayed.  The Court was also informed that on March 29, 2024, Forestry Associates was provided notice of the receivership, the order of stay and a claim form.

9. *Billy G. Hart v.  Allegheny Wood Products, Inc.*
   Magistrate Court of Hampshire County, West Virginia, Case No.:  24-M14C-00042

   a)     Insurance – Doubtful

   b)     Counsel of Record:  None Known

> c)    Complaint alleges that Hart received a "worthless check" in the total amount of $1,247.50, for two loads of white oak logs.
>
> d)    Notes:  On March 27, 2024, Hampshire County Magistrate Court was notified of the Order of Appointing a Receiver and Stay of pending actions.

10. Dallas Hatfield – No pending civil action.

> a)    <u>Insurance</u>: – Undetermined as to whether suit will be filed.
>
> b)    <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC.
>
> c)    <u>Brief Factual Description:</u> Hatfield (an employee of an independent contractor/logger of AWP ("Logger")) claiming he was injured while performing work for Logger while harvesting a tract of timber owned by AWP.
>
> d)    <u>Notes</u>:     Letter from attorney on behalf of Hatfield alleges negligence of AWP.  **<u>On March 14, 2024, a letter and claim form were sent to Grapes' counsel notifying Grapes of the court-ordered stay.</u>**

11. Loop Ridge Hunt Club – No pending civil action.

> a)    <u>Insurance</u>:  No
>
> b)    <u>Counsel of Record</u>:  Mike Frye and Jason Bowles, Jenkins Fenstermaker, PLLC
>
> c)    <u>Brief Factual Description</u>: Possible breach of contract claim regarding a timber tract in Greenbrier County, West Virginia that was logged by an independent contractor ("Logger") engaged by AWP.
>
> d)    <u>Notes</u>: Demand letter received from landowner's counsel. **<u>Letter was sent on March 21, 2024, notifying landowner's counsel of the court-ordered stay.</u>**

12. Brian Grapes – No pending civil action

> a)    <u>Insurance</u>:  Undetermined; nature of claim undisclosed.
>
> b)    <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC
>
> c)    <u>Brief Factual Description</u>: Evidence preservation letter was received from counsel for Grapes.  Grapes was a former employee of AWP.

      d)     <u>Notes</u>: No information relayed as to what type of possible claim, if any, would be asserted. **<u>On March 18, 2024, a letter and claim form was sent to Grapes' counsel notifying Grapes of the court-ordered stay.</u>**

13. Mark Goff – No pending civil action.

      a)     <u>Insurance</u>:  Doubtful.

      b)     <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC

      c)     <u>Brief Factual Description</u>: Alleged breach of contract; Goff claims that AWP timbered trees that were greater than 14" depth at breast height("DBH"), but (Goff) claims trees "up to" 14" DBH, should have been cut.  (Actually, it should be 14" and greater DBH.).

      d)     <u>Notes</u>: Demand letter received; opening demand of $50,000. **Mr. Goff, himself was the contracted logger for tract.  <u>Notice was sent to Goff's counsel regarding the court-ordered stay on March 18, 2024.</u>**

14. Eric Harvey – No pending civil action.

      a)     <u>Insurance</u>: No

      b)     <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC

      c)     <u>Brief Factual Description</u>: Dispute as to AWP's performance of reclamation work; Eric Harvey has refused AWP access to property for purposes of performing reclamation work despite Timber Purchase Agreement.

      d)     <u>Notes</u>:     AWP counsel issued letter of representation to Harvey; advised he was in breach of the Timber Purchase Agreement. Reclamation work pending.

15. BIMBO Bakeries USA, Inc. – No pending civil action.

      a)     <u>Insurance</u>: Possibly.

      b)     <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC

      c)     <u>Brief Factual Description</u>: Alleged property damage. BIMBO claims AWP vehicle damaged on of BIMBO's trucks. AWP employee states that BIMBO driver at-fault.

      d)     <u>Notes</u>:     Demand letter received from Fleet Response on behalf of BIMBO. Claimed damages are $7,729.49. Disputed based on liability.

CORE/3528339.0005/190929139.1

16. Estate of Richard Gray – No pending civil action.

    a)    <u>Insurance</u>: Possibly.

    b)    <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC

    c)    <u>Brief Factual Description</u>: Richard Gray was involved in a single vehicle fatal accident while hauling while traveling with a load of logs picked up from AWP's Moorefield facility on December 28, 2023.

    d)    <u>Notes</u>:     AWP disclaims all liability in connection with this accident based on information obtained, to date.

17. Aurora Sustainable Lands LLC, and its subsidiaries, ("Aurora").

    a)    Insurance – Doubtful.

    b)    Counsel of Record – none yet

    c)    Demand letter/Breach of Contract

    d)    Notes:     Demand letter received March 1, 2024, for $576,060, in settlement for the current outstanding balance of $766,500 under six timber cutting agreements between AWP and Aurora.  **On March 20, 2024, a letter and claim form were sent notifying Aurora of the court-ordered stay.**

18. Penn Virginia Operation Co., LLC. "PVOC") (Notice - Breach of Timber Sale Contract)

    a)    Insurance – Doubtful.

    b)    Counsel of Record – None yet.

    c)    Demand Letter/Breach of Contract. Two notices were sent by Penn Virginia to AWP, (one received on March 4, 2024, and the second on March 7, 2024) alleging a breach of contract of a timber purchase agreement for failment to comply with the agreement's payment provisions.  Specifically, three AWP checks dated February 13, 2024, totaling 444,500.98.

    d)    Notes:  **On March 20, 2024, a letter and claim form were sent notifying PVOC of the court-ordered stay.**

19. Weyerhaeuser – Termination of Log Sale Agreement

a)      Insurance – doubtful

b)      Counsel of Record – none yet

c)      On March 1, 2024, received Notice of Termination of Log Sale Agreement with AWP dated January 31, 2024.

d)      Notes:  **On March 20, 2024, a letter and claim form were sent notifying Weyerhaeuser of the court-ordered stay.**

30

**Schedule 4.07**
**Compliance with Law; Permits**

**Seller Permits as of January 1, 2024**

1. NPDES Permits:

    (a) Riverton NPDES Permit No. WVG610174 through [DATE].

2. West Virginia Business Licenses Pertaining to All Seller Assets.


**Seller Permits as of [May 31, 2024]**

1. NPDES Permits:

    (a) Riverton NPDES Permit No. WVG610174 through [DATE].

2. West Virginia Business Licenses Pertaining to All Seller Assets.

31

**Schedule 4.08**
**Material Contracts**

(a)

1. Wood Chips, Bark, and Sawdust Supply Agreement, dated April 1, 2023, between Allegheny Wood Products, Inc. and Westrock CP, LLC.

2. Revised and Restated Wood Chips, Bark, and Sawdust Supply Agreement, dated November 1, 2023, by and between Allegheny Wood Products, Inc. and Appalachian Wood Pellets, Inc.

3. Allegheny Wood Products, Inc. has traditionally sold large portions of inventory to Allegheny Wood Products International, Inc. pursuant to a course of dealing between the two affiliates.

4. Timber Purchase Agreement dated as of January 6, 2023, by and between Allegheny Wood Timber Products, LLC and Trough Improvement Co LLC.

5. Timber Sales Agreement dated as of November 11, 20221, between Mike Ross Inc. and Allegheny Wood Products LLC.

6. Timber Sales Agreement dated as of November 5, 2021, by and between I.L. Morris and Allegheny Timber Products LLC.

7. Timber Purchase Agreement dated as of September 22, 2022, by and between Allegheny Wood Timber Products, LLC and Michael Miller.

8. Timber Purchase Agreement dated as of June 1, 2022, by and between Allegheny Wood Timber Products, LLC and the Robert Bryne Unified Credit Testamentary Trust.

9. Lease and Agreement dated as of May 20, 1999, by and between Coastal Coal-West Virginia, LLC and Allegheny Wood Products, Inc.

10. Timber Sale Agreement dated as of July 28, 2023, between Allegheny Wood Timber Products, LLC and John McKenzie.

11. Timber Sale Agreement Natale Tract dated as of November 8, 2023, by and between Nicholas Natale and Allegheny Wood Timber Products, LLC, as modified by that certain Addendum to Timber Sale Agreement dated as of December 10, 2023.

12. Purchase Agreement dated as of June 10, 2013, by and between Allegheny Wood Products, Inc. and Estate of A. Houston Booth, as modified by that certain Addendum to Purchase Agreement Disclosure and Consent to a Disclosed Limited Dual Agency dated as of June 13, 2013.

13. Timber Purchase Agreement dated as of October 18, 2023, by and between Allegheny Wood Timber Products, LLC and William R. Borchert, Robert and Sharon Lynch and John D. and Janet L. Lynch.

CORE/3528339.0005/190929139.1

14. Timber Harvest Agreement dated as of January 25, 2024, by and between CoalQuest Development LLC and Allegheny Wood Timber Products, LLC.

15. Memorandum of Timber Supply Agreement dated March 4, 2009, by and between Hartwood Forestland Fund VI Limited Partnership and Allegheny Wood Products, Inc.

(b)

1. None.

33

**Schedule 4.09**
**Tax Returns; Taxes**

1.  State or Federal Income Tax Returns for 2023 have not been filed. Accordingly, any State of Federal income Taxes attributable to the Business for 2023 have not been paid. The Tax Returns for 2023 are on proper extension and there was no tax due in 2023.

2.  █████████████████████████████████████████

34

**Schedule 4.10**
**Labor and Employment Matters; Benefit Plans**

(a)

    1.   See below.[1]

---

[1]   **NTD**: Do not publish names and salaries in a public document. Redact before filing.

CORE/3528339.0005/190929139.1

| Last Name | First Name | Department ID | Location | Start Date | Job Title | Earning Code | Exemp or NonExempt | Full or Part Time | Employed as of 1/1/2024 | Employed as of 5/31/2024 | Hourly Rate | Salary | 2023 Gross Wages |
|-----------|-----------|---------------|----------|------------|-----------|--------------|--------------------|--------------------|--------------------------|---------------------------|-------------|--------|------------------|
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |  | █ | █ | █ |

36

CORE/3528339.0005/190929139.1

CORE/3528339.0005/190929139.1

(c)

    1.  Supplemental Executive Retirement Plan.

(d)

1. *Employees*

  a)  *Deanna Wolford v. Allegheny Wood Products, Inc., et al.*
      Circuit Court of Grant County, West Virginia; Civil Action No.:  23-C-23

      i.  <u>Insurance</u>:  Yes – Chubb – EPLI ($100,000 deductible).

      ii.  <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC.

      iii.  <u>Brief Factual Description</u>: Suit claiming employment discrimination, harassment, and constructive discharge. A former janitorial employee alleges she was forced to quit because of discrimination and harassment.

      iv.  <u>Notes</u>: Claim value is minimal.  Deductible is not close to being met. **An Order for Stay of the proceedings was entered on March 21, 2024.**

  b)  *James Beane, et al. v. Allegheny Wood Product (sic)*
      Federal District Court for the Southern District of West Virginia, Civil Action No.: 5:24-cv-102

      i.  Insurance: None

      ii.  Counsel of Record:  Jason Bowles at Jenkins Fenstermaker, PLLC

      iii.  <u>Brief Factual Description</u>:  Class action suit for alleged violation of the WARN Act, 20 U.S. C. Section 2101-2109, for failure to give a 60- day notice as required under the statute in certain circumstances; and, the West Virginia Wage Payment and Collection Act, W. Va. Code Section 21-5-1, et seq., for failure to make payment of wages on the next regular payday.

      iv.  Notes:  <u>**A Joint Motion for Stay was filed with the court on March 21, 2024**</u>

2. *Independent Contractors*

  a)  *Robert & Mona Mills v. K & S Logging, LLC Kenneth, Sandra Varner & Allegheny Wood Products, Inc.*
      Circuit Court of Pocahontas County, West Virginia; Civil Action No.:  19-C-41

CORE/3528339.0005/190929139.1

     i.    <u>Insurance</u>: Yes – Wesco – General Liability (no deductible)

    ii.   <u>Counsel of Record</u>:  Jason L. Holliday, Dinsmore and Shohl, LLC

   iii.   <u>Brief Factual Description</u>: Claim of Negligence: AWP engaged independent contractor (K & S Logging, LLC.) to log a tract of timber in Pocahontas County, West Virginia during which a contractors' employee was injured.

   iv.   <u>Notes</u>: **<u>Order for Stay of the proceedings was entered on March 21, 2024</u>**.

  b)  Dallas Hatfield – No pending civil action.

     i.    <u>Insurance</u>: – Undetermined as to whether suit will be filed.

    ii.   <u>Counsel of Record</u>:  Jason Bowles, Jenkins Fenstermaker, PLLC.

   iii.   <u>Brief Factual Description</u>: Hatfield (an employee of an independent contractor/logger of AWP ("Logger")) claiming he was injured while performing work for Logger while harvesting a tract of timber owned by AWP.

   iv.   <u>Notes</u>:  Letter from attorney on behalf of Hatfield alleges negligence of AWP.  **<u>On March 14, 2024, a letter and claim form were sent to Grapes' counsel notifying Grapes of the court-ordered stay.</u>**

(e)

1. Allegheny Wood Products, Inc. and Allegheny Wood Products International, Inc. have engaged in a number of layoffs and reductions in force over the last few years due to the financial condition of each company. At times, WARN Act notices were issued. To the knowledge of the Receiver based on reasonable inquiry with management of Allegheny Wood Products, Inc. and Allegheny Wood Products International, Inc., all required WARN Act notices were issued timely.

2. Item number 2 set forth on <u>Schedule 4.10(d)</u> is hereby incorporated herein by reference.

(f)

The following Seller Benefit Plans, each of which is sponsored by Allegheny, all plans terminated on or before June 30, 2024:
1. Allegheny Wood Products Group Health Plan Effective August 1, 2023
2. Guardian Group Dental and Vision Insurance
3. Guardian Voluntary Life, Short-Term Disability and Long Term Disability Insurance
4. Allegheny Wood Products, Inc. 401(k) Profit Sharing Plan

5. Allegheny Wood Products Inc. Flexible Spending Account, administered by J.P. Farley Corporation.

CORE/3528339.0005/190929139.1

**Schedule 4.11**
**Insurance Policies**

1. See table below:

CORE/3528339.0005/190929139.1



42



43

**Schedule 4.12**
**Environmental Matters**

a)

   *Allegheny Wood Products, Inc. v. The Town of Moorefield-*
   Circuit Court of Hardy County, West Virginia, Civil Action No.: *CC-16-2023-C-16*
   a)  Insurance:  No

   b)  Counsel of Record:  Colton Parsons, Steptoe and Johnson, PLLC

   c)  Allegheny Wood Products, Inc. filed action seeking declaratory judgement and injunctive relief. The Town of Moorefield filed a counterclaim of declaratory judgement regarding AWP's Log yard in Moorefield, WV.  Hearing was held wherein the Town of Moorefield's counterclaim for injunctive relief was denied. **The parties reached a settlement and final order was entered on February 14, 2024.**

b)

   1.  None.

c)

   1.  None.

d)

   1.  None.

e)

   1.  None.

f)

   1.  None.

g)

   1.  None.

**Schedule 4.13(a)**
**Intellectual Property**

No patents or patent applications.
No trademark registrations or copyrights

Common law protections for Allegheny Wood Products, Inc. and Allegheny Wood Products International, Inc.

Internet domains registered with Network Solutions -
- o   alleghenywood.co
- o   alleghenywood.com
- o   alleghenywood.net
- o   alleghenywood.org
- o   alleghenywoodproducts.co
- o   alleghenywoodproducts.com
- o   alleghenywoodproducts.net
- o   alleghenywoodproducts.org

CORE/3528339.0005/190929139.1

**Schedule 4.14**
**Supplier Relations**

1. Upon the February 26, 2024 freezing of the accounts of the Sellers and the institution of the Receivership Case, certain Suppliers were not paid or have claims against the Receivership Estate, including without limitation the following:

    (a) R&N Contracting
        355 Eventide Drive
        Petersburg, WV 26847

    (b) RAM Logging
        Richie Moreland
        516 Horizen Ridge Rd.
        Keyser, WV 26726

    (c) Saddle Mountain Logging
        222 Bear Dog Drive
        New Creek, WV 26743

    (d) Beckman Trucking
        3832 Garrett Hwy
        Oakland, MD 21550

    (e) Huffman Logging
        3408 Franklin Pike
        Petersburg, WV 26847

    (f) High Country Logging
        PO Box 137
        Mt. Storm, WV 26739

2. The Sellers are continuing to do business with the following Suppliers related to the Business:

None other than liability, property and casualty insurance agent and insurance providers.

**Schedule 4.15**
**Transactions with Affiliates**

1.  Standing Timber agreements that are not being conveyed by and between Allegheny Wood Products, Inc. and John Crites, Sr.

2.  Use of certain real property not used by the Business owned by JPC Limited Liability Company.

47

**Schedule 4.16**
**Brokers, Finders and Investment Bankers**

None.